WIGGINS, Justice.
In this appeal, we must decide if an internal complaint by an employee against an assisted living facility concerning forged training documents, which the state mandates, gives rise to a wrongful-termination action. The district court determined a wrongful-termination suit lies and submitted the case to the jury. The jury returned a verdict against the assisted living facility for actual and punitive damages. The facility appealed. We transferred the case to the court of appeals. The court of appeals affirmed the actual damages claim but reversed on the punitive damages issue. Both parties asked for further review, which we granted. On further review, we affirm the decision of the court of appeals (1) because the employer’s retaliatory discharge of an at-will employee, who internally reported her employer’s forgery of state-mandated training documents, violated public policy; and (2) because punitive damages are not recoverable, due to the fact that at the time of the employee’s wrongful discharge we did not recognize a public-policy exception to the at-will em *296 ployment doctrine based upon a violation of administrative rules. Accordingly, we remand the case to the district court to enter judgment consistent with our decision.
I. Facts and Prior Proceedings.
A. Facts. This appeal arose from the district court’s denial of a motion for directed verdict. Accordingly, we review the facts in the light most favorable to the party against whom the motion for directed verdict was made. Iowa R.App. P. 6.904(3)(6); Fry v. Blauwelt, 818 N.W.2d 123, 134 (Iowa 2012). Because Oak Park made the motion for directed verdict, we review the facts in the light most favorable to Karen Dorshkind.
Oak Park Place in Dubuque is an assisted living facility. Alternative Continuum of Care owns the Dubuque facility, as well as a network of other assisted living homes all named Oak Park. Headquarters for the company is in Madison, Wisconsin.[1]
Oak Park contains 131 beds and has fifty-five employees who provide patients with several different levels of care. The lowest level of care includes the administration of medications, assistance with bathing and dressing, and help with mobility to and from meals.
Oak Park is also certified as a dementia-specific assisted living program. This means the facility holds itself out as providing specialized care in a dedicated setting for patients with dementia but may also provide care to patients without cognitive disorders. In late 2008, Oak Park had approximately thirteen patients in its dementia program.
Because Oak Park includes a special unit for its patients suffering from dementia, Oak Park is subject to the provisions in Iowa Code chapter 231C (2007) and the Iowa Administrative Code rule 321-25.34(1) (2006),[2] which require direct care staff to complete dementia-specific training. Forgery of documents certifying completion of this training constitutes a violation of law. See Iowa Code § 231C.14(1), (3) (imposing civil penalties for noncompliance with regulations and interfering in any way with an Iowa Department of Inspections and Appeals (DIA) representative). The DIA is responsible for enforcing these provisions. Iowa Admin. Code r. 321-26.3.
Dorshkind worked at Oak Park from April 10, 2006, to September 5, 2008. Dorshkind was hired as an at-will employee for the position of sales and marketing assistant. About six months later, Oak Park promoted her to marketing director. Dorshkind’s primary responsibility was to increase the number of patients at Oak Park.
For the first two years of her employment, Dorshkind’s supervisor was Marthe Jones, the regional marketing director. Thereafter, in April 2008, Dorshkind began reporting to Tim Hendricks, the housing director for Oak Park. Hendricks reported to Toni Carruthers, the regional director of operations. Carruthers, in turn, was supervised by Scott Frank, the CEO and majority owner of the Oak Park network.
During an unannounced inspection by the DIA on July 24, 2008, Dorshkind witnessed what she believed to be her super *297 visor, Hendricks, and the supervisor of the certified nursing assistants at Oak Park, Kristi Niemer, falsifying state-mandated training documents for the dementia program. Dorshkind testified that she witnessed Niemer making copies of test papers and then later saw Niemer with Hendricks in his office with some stacks of paper. Niemer was filling out answers to what appeared to be true or false questions. Hendricks had another pile of papers and was writing on them. A different stack of papers was stamped “post-test” at the top. Eyewitnesses testified that the two did not attempt to hide what they were doing. Instead, Hendricks and Niemer told other employees that their acts were going to “save the day for Oak Park.”
Dorshkind left Hendricks’ office and returned to her own. Pat True, the director of maintenance at Oak Park, later came by and said he had also seen Niemer and Hendricks forging training documents. True had been called into Hendricks’ office to sign a paper. At that time, he observed the two forging other employees’ names. True told Hendricks he should at least use different colored pens to vary the signatures he was forging on the documents. Hendricks later laughed and recounted the comment to Denise Schiltz, the director of nursing at Oak Park, who also witnessed the incident.
Schiltz told Dorshkind she had seen Hendricks and Niemer forging staff names on the dementia training documents. During testimony, Schiltz said that none of the training certified in the documents ever occurred. Schiltz realized Hendricks and Neimer’s conduct constituted forgery and immediately submitted her resignation on July 24.
For obvious reasons, Dorshkind did not report these concerns to her then-supervisor, Hendricks. Approximately six weeks after the incident, Dorshkind called Jones, her former supervisor who was then working as the marketing director in Madison, which was not a supervisory position and did not involve human resources responsibilities. Jones described her relationship to Dorshkind as a coworker or peer. Jones admitted that at the time of the report, there was no supervisor — subordinate relationship between her and Dorshkind.
Dorshkind told Jones about the suspected forgery. During her testimony, Dorsh-kind explained her rationale for doing so as follows: “Well, my concern was, number one, for the residents. If tests had been falsified, I felt that meant that the staff hadn’t had the training. My first concern was always the residents.” Dorshkind was also concerned Oak Park would lose its license. While speaking with Jones, Dorshkind additionally communicated her belief that two employees, including her supervisor, were having an extramarital affair.
When testifying regarding her conversation with Jones, Dorshkind stated that Jones asked Dorshkind if she wanted Jones to talk to Tara Klun, the director of human resources for Oak Park at the Madison headquarters. Jones testified, “I said, Karen, I don’t know what to do. Would you like me to go to human resources and talk to them and see what path you should take?” Later, Jones added, “I told [Dorshkind] I would talk to Tara Klun and ask her what she should do in this situation.”
Dorshkind believed the internal report was a collaborative effort, even though Jones said she was the first one to raise the question of whether it should be reported to Klun. Dorshkind had gone to Jones to get “Marthe’s advice.” However, Dorshkind testified that Jones believed her *298 going to Klun “would be the best way that we can handle any situation.”
Jones spoke with Klun on September 3. Klun testified that “she understood at the time that Ms. Dorshkind and Ms. Jones had just completed a telephone call before [Jones] came into [Klun’s] office to talk.” During Jones’s conversation with Klun, Jones reported, “Karen Dorshkind called me today” and said “Kristi and Tim were falsifying documents.” Jones specifically stated that the “falsification that had occurred,” as well as “an illicit personal relationship,” “[wa]s reported by Ms. Dorsh-kind.” Jones said, “[W]e [meaning Dorshkind and Jones] don’t know what to do.”
Klun informed the CEO of both allegations. Klun testified that if an employee has a problem and wants to make a report, the employee “would follow the chain of command and go to their supervisor, and if they didn’t feel comfortable, to the next level and/or human resources.”
On September 4, 2008, Klun and Car-ruthers went to Oak Park to investigate the claims. Immediately when Klun arrived, Dorshkind approached her and said, “Tara, I’m glad you’re here. Can I talk to you alone[?]” Klun responded, “not now ... let’s wait until we can talk in private.” Klun never spoke with Dorshkind privately to inquire about what she knew regarding the allegation, which Klun admits, “that she reported.” During her testimony, Klun explained her rationale for not approaching Dorshkind as follows:
I believe that she would not have anything further than what Marthe Jones shared with me, for she shared the full conversation that she had with Karen. And at the time I did not feel that she would give me any new information on the 4th of September.
Klun later reiterated on cross-examination that she believed Jones “shared with me the entirety” of Dorshkind’s information regarding the allegations. Jones was the first person who reported the forgery to Klun.
After conducting a two-day investigation, both Klun and Carruthers concluded there was no validity to Dorshkind’s report of forgery and an affair. Klun later admitted that her investigation of the forgery allegations was “very poor.”
The following day, Oak Park terminated Dorshkind’s employment. In a letter signed by Klun and Carruthers, the basis for the termination was stated as follows:
After a long 2 day and careful investigation, speaking with many individuals, ones you specifically mentioned, we have come to a conclusion that you have not been truthful. Upon the investigation we learned of several incidents where you have not been truthful; spreading rumors regarding a false relationship between two employees, malicious statements regarding forging of documents, and false statement to a Regional Director about move in numbers, all with in these two days. This is jeopardizing and affecting the working environment at Oak Park.
Due to the above issues, we are at a point where we are unable to trust you. Therefore, it is in Oak Park’s best interest to end the relationship effective immediately.
(Emphasis added.) Jones was also fired.
On September 25 and 29, after receiving a complaint from Schütz about the incident on July 24, the DIA conducted an on-site investigation at Oak Park. In its final report, the DIA concluded certain state-mandated documents relating to the dementia training program had been forged. Accordingly, the DIA imposed a civil penalty of $10,000 and barred the facility from *299 admitting any new patients while under conditional certification status.
B. Prior Proceedings. On September 7, 2010, Dorshkind sued Oak Park for wrongful discharge of employment in violation of public policy. Oak Park responded by filing a motion for summary judgment, arguing no established public policy protects Dorshkind’s activity because she did not report the alleged misconduct externally to the DIA, but rather, only internally. Thus, Oak Park urged the district court to find Dorshkind’s termination does not jeopardize public policy. Oak Park also alleged there was an overriding business justification for the discharge.
The district court denied the motion. The matter proceeded to a jury trial on November 15, 2011. Before resting, Dorshkind moved the district court to present the issue of punitive damages to the jury. Oak Park resisted, claiming Iowa has not previously recognized the public policy asserted by Dorshkind, and thus, punitive damages are not recoverable. The district court granted Dorsh-kind’s motion and rejected Oak Park’s argument. The district court held:
There is a defined public policy to protect residents in assisted living facilities, particularly those who suffer from dementia. Toward that end, the State requires training to ensure that people with dementia receive proper care and are not abused in any manner. That is the purpose of the regulation.
Accordingly, the district court allowed the question of punitive damages to be submitted to the jury.
Oak Park then moved for directed verdict on the same grounds as the motion for summary judgment. The district court denied the motion without explanation.
The jury returned a verdict for Dorsh-kind, finding Oak Park terminated her in retaliation for whistleblowing and with a willful and wanton disregard for the rights or safety of others. Accordingly, the jury awarded $178,500 in compensatory damages, including $156,000 in lost pay and benefits and $22,500 in emotional distress damages. The jury award also included $178,500 in punitive damages. The district court entered judgment on November 22.
Oak Park timely filed a notice of appeal. We transferred the case to the court of appeals. The court of appeals affirmed the district court judgment in part by finding the public-policy exception protected Dorshkind’s employment from retaliatory termination and consequently, concluded the district court properly denied Oak Park’s motion for directed verdict. However, the court of appeals reversed the district court’s decision to submit the issue of punitive damages to the jury. The court of appeals held “there has been no specific declaration by our courts or legislature that internal whistleblowing may be protected under certain circumstances.”
Both parties sought further review, which we granted.
II. Issues.
The first issue is whether an at-will employee, who was discharged by her employer after making an internal report of forgery regarding state-mandated documents certifying dementia training, is protected from retaliatory termination under the public-policy exception to the at-will employment doctrine. The second issue asks whether an at-will employee who is wrongfully discharged based upon a violation of administrative rules may recover punitive damages.
III. Standard of Review.
This appeal arises from the district court’s denial of a motion for directed verdict. Thus, our review is for correction *300 of errors at law. Estate of Ryan v. Heritage Trails Assocs., Inc., 745 N.W.2d 724, 728 (Iowa 2008). We review the evidence in the light most favorable to the nonmov-ing party, taking into consideration all reasonable inferences that could fairly be made by the jury, regardless of whether the evidence is contradicted. Slocum v. Hammond, 346 N.W.2d 485, 494 (Iowa 1984). Our role on appeal is to decide “whether the trial court correctly determined there was sufficient evidence to submit the issue to the jury.” Easton v. Howard, 751 N.W.2d 1, 5 (Iowa 2008).
IV. Analysis.
A. At-Will Employment. Employment in Iowa is at will. Berry v. Liberty Holdings, Inc., 803 N.W.2d 106, 109 (Iowa 2011). Therefore, unless the employee has a valid contract of employment, “the employment relationship is terminable by either party ‘at any time, for any reason, or no reason at all.’ ” Fitzgerald v. Salsbury Chem., Inc., 613 N.W.2d 275, 280 (Iowa 2000) (quoting Phipps v. IASD Health Servs. Corp., 558 N.W.2d 198, 202 (Iowa 1997)). Yet, the employer’s right to discharge an employee under an at-will employment contract may be limited by public policy considerations. Teachout v. Forest City Cmty. Sch. Dist., 584 N.W.2d 296, 299 (Iowa 1998).
B. Public-Policy Exception. Iowa follows the majority of states by carving out a public-policy exception to the general rule of at-will employment for wrongful-discharge claims. See Springer v. Weeks & Leo Co., 429 N.W.2d 558, 560 (Iowa 1988) (adopting the public-policy exception in Iowa).
Public policy is an elusive legal construct. We have previously said public policy is that which “ ‘generally captures the communal conscience and common sense of our state in matters of public health, safety, morals, and general welfare.’ ” Berry, 803 N.W.2d at 110 (quoting Jasper v. H. Nizam, Inc., 764 N.W.2d 751, 761 (Iowa 2009)). Another definition includes those matters “fundamental to citizens’ social rights, duties, and responsibilities.” Id. Once identified, the public policy “becomes a benchmark in the application of our legal principles.” Jasper, 764 N.W.2d at 761.
An employee seeking protection under the public-policy exception in his or her wrongful-discharge claim must prove the following elements:
(1) the existence of a clearly defined and well-recognized public policy that protects the employee’s activity; (2) this public policy would be undermined by the employee’s discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.
Berry, 803 N.W.2d at 109-10. The first two elements constitute questions of law to be determined by the court. Fitzgerald, 613 N.W.2d at 282. If the discharged employee successfully establishes each of these elements, “he or she is entitled to recover both personal injury and property damage.” Berry, 803 N.W.2d at 110.
C. Prior Application of the Public-Policy Exception. In Iowa, we have recognized many situations where the public-policy exception applies. Below is a selection of cases to illustrate how we have previously implemented the exception.
1. Enforcing a statutory right. We have consistently held that an employee cannot be discharged in retaliation for enforcing a statutory right. The first case to do so was Springer, 429 N.W.2d 558. There, we held an employer who termi *301 nated an employee for filing a workers’ compensation claim could be liable for wrongful discharge. Id. at 560-61. We reaffirmed Springer in three subsequent cases. See Clarey v. K-Products, Inc., 514 N.W.2d 900, 902 (Iowa 1994) (finding sufficient evidence to support a wrongful-discharge jury verdict in favor of a plaintiff terminated after fifing a workers’ compensation claim); Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d 682, 685 (Iowa 1990) (holding even though the discharge did not directly interfere with payment of benefits, the firing violated public policy, because it would chill the assertion of workers’ compensation rights and erode the employer’s obligation to pay valid claims); Niblo v. Parr Mfg., Inc., 445 N.W.2d 351, 353 (Iowa 1989) (deciding there was sufficient evidence to support a jury’s verdict finding the plaintiff had been terminated for threatening to file a workers’ compensation claim).
We extended the holding in Springer to persons who filed for unemployment benefits. Lara v. Thomas, 512 N.W.2d 777, 782 (Iowa 1994). In extending Springer, we reemphasized our language in Smith by stating, “Employers cannot be permitted to intimidate ‘employees into foregoing the benefits to which they are entitled in order to keep their jobs.’ ” Id. (quoting Smith, 464 N.W.2d at 686).
2. Refusal to participate in illegal activity. We have two cases allowing a wrongful-discharge claim to proceed when an employee refuses to participate in an illegal activity. The first is Fitzgerald, 613 N.W.2d 275. There, we held an employee had a claim for wrongful discharge because he intended to testify truthfully in a legal proceeding, rather than perjure himself. Id. at 285-86. In reaching this conclusion, we cited decisions from other jurisdictions that allowed such claims when an employee refused to commit perjury. Id. at 286. Although, Fitzgerald did not testify before his discharge, we said the employee must only show he had a good faith intent to testify truthfully. Id. at 287.
The second case to hold a person cannot be discharged for failing to participate in illegal activity is Jasper, 764 N.W.2d 751. In Jasper, an employee refused to work in an understaffed room at a daycare center, a situation violating the administrative rules issued by the Iowa Department of Human Services. Id. at 758-59. The daycare provider then terminated her employment. Id. at 759. In determining the appropriate public policy, we looked to the administrative regulations of this state. Id. at 765. We found the department adopted the rules for the health, safety, and welfare of children in daycare facilities. Id. at 766. Accordingly, we affirmed the jury verdict because Jasper had presented sufficient evidence to establish she was terminated because she refused to violate the administrative regulations. Id. at 768.
3. Whistleblowing. A third category of cases where we have said discharging an employee violates public policy is whistle-blowing. We issued two cases on the same day in September 1998 to discuss this issue. The first matter was Tullis v. Merrill, 584 N.W.2d 236 (Iowa 1998). There, Tullís complained internally to the business owner that the company was not paying his insurance benefits as part of his promised wages. Id. at 237-38. Tullís claimed this failure to pay wages violated chapter 91A of the Iowa Code. Id. at 238. Although Tullís could have filed a complaint with the labor commissioner under Iowa Code section 91A.10, he chose to make a complaint in-house. After doing so, his employer terminated him. Id.
He brought a wrongful-discharge action against his employer based on the public- *302 policy exception to the at-will employment doctrine. Id. The jury returned a verdict in favor of Tullis’s wrongful-discharge claim. Id. The employer appealed. Id.
On appeal, the employer argued the public-policy exception only applied if the employee made the complaint to the labor commissioner under section 91A.10. Id. at 239. The employer claimed the statute only protected an employee who made a complaint with the commissioner. Id. The statute provided:
An employer shall not discharge or in any other manner discriminate against any employee because the employee has filed a complaint, assigned a claim, or brought an action under this section or has cooperated in bringing any action against an employer.
Iowa Code § 91 A.10(5) (1995). In response to this claim, we held public policy prohibited Tullis’s firing for making a wage claim, and the internal complaint satisfied this public policy. Tullis, 584 N.W.2d at 239-40.
The other case filed that day was Teachout, 584 N.W.2d 296. There, a teacher’s assistant claimed the school terminated her after she reported alleged child abuse to her supervising teacher and orally to the department of human services. Id. at 298-99. In Teachout, the Code did not expressly protect an employee for making a complaint of child abuse. However, the Code did provide
[cjhildren in this state are in urgent need of protection from abuse. It is the purpose and policy of this [statute] to provide the greatest possible protection to victims or potential victims of abuse through encouraging the increased reporting of suspected cases of such abuse, insuring the thorough and prompt investigation of these reports.
Iowa Code § 232.67. Therefore, we concluded the public policy of Iowa protects a person discharged by an employer because he or she makes a good faith complaint of child abuse. Teachout, 584 N.W.2d at 300-01. However, we held Teachout failed to establish a jury question on the element of causation; she demonstrated only that her “termination occurred after the District learned she had engaged in a protected activity,” not that her conduct was a determinative factor. Id. at 302.
Another case dealing with whistleblow-ing was Ballalatak v. All Iowa Agriculture Ass’n, 781 N.W.2d 272 (Iowa 2010). In Ballalatak, the employee claimed he was fired for internally complaining that the company was not properly handling a fellow employee’s workers’ compensation claim. Id. at 275. In determining whether a claim existed, we favorably cited an Eighth Circuit Court of Appeals opinion where the federal court determined we would recognize a public-policy exception to the employment at-will doctrine when an employee makes an internal complaint about employee safety. Id. at 277 (citing Kohrt v. MidAmerican Energy Co., 364 F.3d 894, 902 (8th Cir.2004)). We found, however, that the Iowa workers’ compensation statutes did not provide a public-policy exception for an internal complaint based on a fellow employee’s concern that the employer may not be complying with Iowa’s workers’ compensation laws. Id. at 278.
D. Application of Legal Principles. With these principles and jurisprudence in mind, we turn to the case at hand. The jury returned a verdict for Dorshkind. Thus, the jury resolved the factual issues in the third and fourth elements by finding Oak Park discharged Dorshkind because of her whistleblowing and that Oak Park had no overriding business justification for the discharge. Therefore, we need only address the first and second elements, *303 which are legal questions — the existence of a clearly defined and well-recognized' public policy that protects Dorshkind’s activity and that Dorshkind’s discharge from employment would undermine this public policy.
1. Clearly defined and well-recognized public policy. To resolve the issue before us, we must ask whether a clearly defined and well-recognized public policy exists to bar Dorshkind’s termination for internal whistleblowing relating to Oak Park’s forgery of state-mandated training documents for its dementia program. This is a question of law. Fitzgerald, 613 N.W.2d at 282.
We look primarily to our statutes to determine whether an implied or express public policy exists but such policies may also be found in our constitution. Id. at 283; see also Kohrt, 364 F.3d at 899 (applying Iowa law). The court does not look only to statutes expressly mandating protection for at-will employees. Fitzgerald, 613 N.W.2d at 283. “[W]e [also] look to other statutes which not only define clear public policy but imply a prohibition against termination from employment to avoid undermining that policy.” Id. However, we do not divine public policy from internal company policies or agreements. Ballalatak, 781 N.W.2d at 278. Administrative regulations are another source of public policy “when adopted pursuant to a delegation of authority in a statute that seeks to further a public policy.” Jasper, 764 N.W.2d at 764. Courts in other jurisdictions also recognize professional rules as sources of public policy. See, e.g., Rocky Mountain Hosp. & Med. Serv. v. Mariani, 916 P.2d 519, 523 (Colo.1996) (holding state-accountancy-board rules may constitute articulations of public policy in case where a CPA was terminated in retaliation for complaining to supervisors about questionable accounting practices).
We cautiously identify policies to support an action for wrongful discharge under the public-policy exception. We do so because
[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself. Moreover, it could unwittingly transform the public policy exception into a “good faith and fair dealing” exception, a standard we have repeatedly rejected.
Fitzgerald, 613 N.W.2d at 283 (citations omitted); accord Lloyd v. Drake Univ., 686 N.W.2d 225, 230-31 (Iowa 2004) (rejecting a wrongful-discharge claim lodged by a security guard who was fired after forcibly restraining a student suspected of assault because the asserted public policy against crime is generalized, not “clearly defined”). Thus, the exception is narrowly circumscribed to only those policies clearly defined and well-recognized to protect those with a compelling need for protection from wrongful discharge. See, e.g., Harvey v. Care Initiatives, Inc., 634 N.W.2d 681, 685 (Iowa 2001) (rejecting an independent contractor’s claim for wrongful discharge by finding “no compelling need, as we did for at-will employees, to support a wrongful termination tort”). The “well recognized and clearly defined” requirement ensures “employers have notice that their dismissal decisions will give rise to liability.” Fitzgerald, 613 N.W.2d at 282-83.
We have previously held that an employer cannot discharge an employee because he or she whistleblows if there is a public policy to protect the integrity and employment of those who uphold the law by reporting illegalities in the workplace. Teachout, 584 N.W.2d at 300-01. In other words, whistleblowing is an exception to the at-will employment doctrine if the pub- *304 lie policy of this state requires protection of the public by ensuring “infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare” are properly reported. Palmer v. Brown, 242 Kan. 893, 752 P.2d 685, 689 (1988) (applying this principle under Kansas law).
We find the Code and our administrative rules support a clearly defined and well-recognized public policy under the exception to the at-will employment doctrine. Chapter 231C, governing assisted living facilities, expressly states the legislature’s findings, purpose, and intent in enacting chapter 231C as follows:
1. The general assembly finds that assisted living is an important part of the long-term care continua in this state. Assisted living emphasizes the independence and dignity of the individual while providing services in a cost-effective manner.
2. The purposes of establishing an assisted living program include all of the following:
a. To encourage the establishment and maintenance of a safe and homelike environment for individuals of all income levels who require assistance to live independently but who do not require health-related care on a continuous twenty-four-hour per day basis.
b. To establish standards for assisted living programs that allow flexibility in design which promotes a social model of service delivery by focusing on independence, individual needs and desires, and consumer-driven quality of service.
c.To encourage public participation in the development of assisted living programs for individuals of all income levels.
3.It is the intent of the general assembly that the department of elder affairs establish policy for assisted living programs and that the department of inspections and appeals enforce this chapter.[3]
Iowa Code § 231C.1 (2007) (emphasis added).
The legislature, by including a findings, purpose, and intent provision in chapter 231C, demonstrated a clearly defined and well-recognized public policy to make assisted living available throughout the state and to ensure the safety of persons residing in assisted living facilities. Other provisions of chapter 231C supporting this public policy include rulemaking authority by the elder affairs department for certification of assisted living facilities and requiring compliance with fire and safety standards. Id. §§ 231C.3, .4.
Turning to the administrative rules, we find the legislature clearly authorized the elder affairs department to promulgate rules regarding the certification of assisted living facilities “to ensure, to the greatest extent possible, the health, safety, and well-being and appropriate treatment of tenants.” Id. § 231C.3(l)(a). Specifically, “[t]he department may also establish by rule in accordance with chapter 17A minimum standards for ... dementia-specific assisted living programs.” Id. § 231C.3(6).
*305 At the time of Dorshkind’s report and discharge, the administrative rules stated:
25.34(1) All personnel employed by or contracting with a dementia-specific program shall receive a minimum of six hours of dementia-specific education and training prior to or within 90 days of employment or the beginning date of the contract.
25.34(2) The dementia-specific education or training shall include, at a minimum, the following:
a. An explanation of Alzheimer’s disease and related disorders;
b. The program’s specialized dementia care philosophy and program;
c. Skills for communicating with persons with dementia;
d. Skill for communicating with family and friends of persons with dementia;
e. An explanation of family issues such as role reversal, grief and loss, guilt, relinquishing the care-giving role, and family dynamics;
f. The importance of planned and spontaneous activities;
g. Skills in providing assistance with instrumental activities of daily living;
h. The importance of the service plan and social history information;
i Skills in working with challenging tenants;
j. Techniques for simplifying, cueing, and redirecting; and
⅛. Staff support and stress reduction.
25.34(3) All personnel employed by or contracting with a dementia-specific program shall receive a minimum of two hours of dementia-specific continuing education annually.
25.34(4) An employee who provides documentation of completion of a dementia-specific education or training program within the past 12 months shall be exempt from the education and training requirement of subrule 25.34(1).
Iowa Admin. Code r. 321 — 25.34(1)—(4).
Thus, the administrative rules specifically articulated a concern for the health, safety, and welfare of dementia patients in assisted living facilities. Acting on this concern, the elder affairs department required the implementation of a training program with accompanying state-mandated training documents to safeguard dementia patients’ health, safety, and welfare.
In Teachout, we found language in a statute similar to the language in chapter 231C and the administrative rules promulgated under chapter 231C supported a public policy that made the reporting of child abuse a protected activity. 584 N.W.2d at 300-01; see also Trombetta v. Detroit, Toledo & Ironton R.R., 81 Mich. App. 489, 265 N.W.2d 385-88 (1978) (stating, in dicta, that it would have been impermissible for the employee to be discharged for refusing to falsify pollution control reports that are required to be filed with the state). As in Teachout, based on the plain language found in the statutes and rules, we find a strong public policy to ensure the proper care of dementia patients.
We should not allow an employer to ignore the substance either of a statute or administrative regulation or the statement of public policy that it represents. “There is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens.” Palmateer v. Int’l Harvester Co., 85 Ill.2d 124, 52 Ill.Dec. 13, 421 N.E.2d 876, 879 (1981). Accordingly, we find Dorshkind’s whistleblowing, which involved reporting violations of law that jeopardized the health, safety, and welfare of dementia patients in an assisted living *306 facility, is supported by a clearly defined and well-recognized public policy. Thus, we conclude Dorshkind’s claim satisfies the first element of the public-policy exception.
2. Discharge undermines public policy. Under the second element, we must determine whether Dorshkind’s discharge from employment undermines this public policy. Again, this is a question of law. Fitzgerald, 613 N.W.2d at 282. We consider the impact of the discharge on both the dismissed employee and other employees. Id. at 288. “An essential element of proof to establish the discharge undermines or jeopardizes the public policy necessarily involves a showing the dismissed employee engaged in conduct covered by the public policy.” Id. at 287. If it can be shown the whistleblower engaged in conduct in furtherance of public policy and was dismissed for doing so, and that discharge will discourage other employees from engaging in the same conduct, then public policy is undermined. Id. at 288.
Considering such factors, we conclude Dorshkind’s discharge did undermine the public policy at stake. Dorshkind’s conduct involved internally reporting what she believed were two coworkers forging state-mandated training documents pertaining to the care of dementia patients. Such an act advances a clear public policy. Moreover, the impact of the dismissal affected Dorshkind by punishing her for reporting conduct jeopardizing the health, safety, and welfare of dementia patients.
We next examine the impact of the discharge on other employees. Dorshkind’s dismissal chills reporting by other employees for similar workplace illegalities. Cf. Smith, 464 N.W.2d at 685 (holding the discharge for asserting a workers’ compensation claim violated public policy, even though there was no direct interference with the payment of benefits, because it would chill the claiming of workers’ compensation rights and erode the employer’s obligation to pay valid claims). As the Eighth Circuit accurately observed when applying Iowa law,
If employers were permitted to discharge employees for such conduct, then employees would be hesitant to articulate safety concerns because to do so would potentially put their jobs at risk. Clearly, a public policy that encourages employees “to institute [a] new and [to] perfect existing safety programs” is undermined when an employee can be discharged for doing exactly what the policy encourages.
Kohrt, 364 F.3d at 902 (quoting Iowa Code § 88.1(1) (2003)). Thus, allowing employers to fire employees for whistleblowing effectively hangs a sword of Damocles over the heads of concerned employees like Dorshkind, forcing them to choose between protecting others and sacrificing their employment.
An additional consideration is that Dorshkind made her complaint internally. We believe such a claim for internal whistleblowing stands for a number of reasons.[4] First, we have previously held internal reporting is actionable, even *307 where an applicable statute describes a method for lodging the whistleblower’s complaint externally. Tullis, 584 N.W.2d at 289-40 (finding the employee had a valid wrongful discharge claim after complaining internally to his boss about unpaid wages and not utilizing the labor commissioner to determine the wages, as provided in Iowa Code section 91A.10). Second, whether the employee makes the complaint internally or externally does not change the public-policy considerations of our state. Third, discharging an employee for making an internal complaint still undermines the public policy. Fourth, the requirement of causation assures us the internal report was made to further the public policy of this state, rather than for other reasons.
Finally, it makes more sense that an employee would first discover the problem *308 and report it internally before lodging a complaint externally.[5] Moreover, this allows the employer to correct the deficiency in a reasonably prompt manner. When the government becomes involved, the employer may take the position that the conduct does not violate a statute or rule to avoid sanctions. Then, the only resolution is a legal battle. By first bringing the problem to the attention of the employer without outside intervention, the matter can be handled quickly and in a less costly manner. However, if the employer does not correct a perceived problem, then the authorities can intervene to determine the extent of the problem and its amelioration.
Accordingly, we find Dorshkind’s internal report of Oak Park’s violations of law and regulations relating to the forgery of state-mandated documents for the dementia program is a protected activity as a matter of law. Preventing the retaliatory termination of internal whistleblowers not only shields the employee from tortious conduct, but also protects the public by ensuring “infractions of rules, regulations, or the law pertaining to public health, safety, and the general welfare” are properly reported. Palmer, 752 P.2d at 689.
V. Punitive Damages.
Regarding the second issue, the crux of Oak Park’s argument is that we have not previously recognized a claim for wrongful discharge arising from an employee reporting a violation of the administrative rules in question. For authority, Oak Park cites Jasper, where we said,
Although the tort of wrongful discharge in violation of public policy has been recognized in Iowa for over twenty years, this case is the first time we have specifically recognized a cause of action for wrongful discharge arising from the refusal of the employee to violate administrative rules. Additionally, there has otherwise been no declaration that the subject matter of the administrative rules in dispute in this case were of the type that would support a tort of wrongful discharge.
764 N.W.2d at 774. In Jasper the public policy involved was derived solely from an administrative rule. Id.
Here, we derived the public policy from chapter 231C. We used the administrative rules to show the agency recognized the public policy and passed rules to protect the patients in assisted living facilities. In fairness, however, the training requirements were contained in an administrative rule. See Iowa Admin. Code r. 321-25.34(l)-(4). Thus, the reported violation is inextricably intertwined with the public policy supporting the exception to the at-will employment doctrine. Moreover, the misconduct reported by Dorshkind preceded our holding in Jasper. Accordingly, as in Jasper, an employer cannot willfully and wantonly disregard the rights of an employee based upon a violation of an administrative rule when at the time of the discharge, we did not recognize administrative rules as a source of public policy. 764 N.W.2d at 774.
*309 Therefore, the district court erred in submitting Dorshkind’s punitive damages claim to the jury.
VI. Conclusion and Disposition.
We conclude that an employer’s retaliatory discharge of an at-will employee, who internally reported her employer’s forgery of state-mandated training documents for a dementia program in an assisted living facility, in contravention of state statutes and administrative regulations, violated public policy. Therefore, we affirm that part of the court of appeals decision and the district court judgment regarding actual damages. We also affirm the court of appeals decision, finding the district court should not have submitted the punitive damages claim to the jury because at the time of Dorshkind’s discharge, we did not recognize a public-policy exception to the at-will employment doctrine based upon a violation of administrative rules. Thus, on the punitive damages issue, we reverse the district court judgment and conclude Dorshkind is not entitled to punitive damages. We remand the case to the district court to enter judgment consistent with our decision.
DECISION OF COURT OF APPEALS AFFIRMED; DISTRICT COURT JUDGMENT AFFIRMED IN PART AND VACATED IN PART, AND REMANDED WITH DIRECTIONS.
All justices concur except CADY, C.J., who specially concurs, and MANSFIELD, WATERMAN, and ZAGER, JJ., who concur in part and dissent in part.

. References hereafter in the opinion to "Oak Park” refer only to the Dubuque facility, unless specifically stated otherwise.

. The rules pertaining to elder care in the Iowa Administrative Code have been restructured since 2008. These rules are now located under the Iowa Department of Inspections and Appeals (Agency 481) in chapter 69. See Iowa Admin. Code r. 481 — 69.30(1)—(5).

. To ensure the fulfillment of this intent, the legislature provided a procedure for lodging complaints concerning the operation of an assisted living facility. See Iowa Code § 231C.7(1) (“Any person with concerns regarding the operations or service delivery of an assisted living program may file a complaint with the department of inspections and appeals.”). Moreover, the legislature prohibited retaliation by the assisted living program against an employee "who has initiated or participated in any proceeding authorized by this chapter.” Id. § 231C.13.

. Other jurisdictions have similarly identified internal whistleblowing as a protected activity for purposes of establishing wrongful-discharge claims. See, e.g., Kearl v. Portage Envtl., Inc., 205 P.3d 496, 500 (Colo.App.2008) (holding “Colorado has a clearly expressed public policy against terminating an employee in retaliation for the employee's good faith attempt to prevent the employer's participation in defrauding the government” in case involving an employee who was fired for reporting concerns to his superiors about a plan to provide remediation services at a uranium enrichment plant); Lanning v. Morris Mobile Meals, Inc., 308 Ill.App.3d 490, 242 Ill.Dec. 173, 720 N.E.2d 1128, 1130-31 (1999) (holding a food service worker, who was fired for reporting the employer’s unsafe food preparation practices in violation of the law, had a valid complaint of retaliatory dis *307 charge where she made an internal complaint, not a report to a public official); Moyer v. Allen Freight Lines, Inc., 20 Kan.App.2d 203, 885 P.2d 391, 395 (1994) (affirming the denial of a motion for directed verdict in favor of the employee who reported equipment failures to the company’s management and was subsequently fired, based on protection afforded to employees reporting “to either company management or law enforcement officials’’ (emphasis removed)); Barker v. State Ins. Fund, 40 P.3d 463, 468 (Okla.2001) (“Oklahoma law protects both internal and external reporting of whistle-blowers who establish a sufficient public policy violations from retaliatory discharge.”).
Only the minority of courts refuse to protect an employee who makes an internal report. See Wholey v. Sears Roebuck, 370 Md. 38, 803 A.2d 482, 496 (2002) ("To qualify for the public policy exception to at-will employment, the employee must report the suspected criminal activity to the appropriate law enforcement or judicial official, not merely investigate suspected wrong-doing and discuss that investigation with co-employees or supervisors.”).
Some jurisdictions give less credence to the difference between internal and external reports, focusing instead on the nature of the claim. See, e.g., Green v. Ralee Eng’g Co., 19 Cal.4th 66, 78 Cal.Rptr.2d 16, 960 P.2d 1046 (1998) (rejecting termination following the employee's internal reports concerning the employer’s alleged failure to comply with inspection practices mandated by regulations implementing the Federal Aviation Act); Thomas v. Med. Ctr. Physicians, P.A., 138 Idaho 200, 61 P.3d 557, 565-66 (2002) (reversing summary judgment for the employer, where the employee was fired for reporting misconduct to the supervisor); Connelly v. State, 271 Kan. 944, 26 P.3d 1246 (2001) (finding state troopers who internally rejected and protested illegal activity in not enforcing laws designed for the public safety are protected from retaliatory discharge).
Other states have whistleblower statutes that provide discharged employees with a cause of action, regardless of whether the report was made internally or externally. See, e.g., N.D. Cent.Code § 34-01-20(3) (West, current through the 2011 Reg. and Spec. Sess. of the 62nd Legis. Assemb.) (preventing the termination of an employee who “in good faith, reports a violation or suspected violation of federal, state, or local law, ordinance, regulation, or rule to an employer, a governmental body, or a law enforcement official ” (emphasis added)).
Among the courts protecting internal whis-tleblowers, some have specifically addressed the advancement of public policy found in the common law, not statutes, when the employee’s report serves to protect the public’s health, safety, and welfare. White v. Gen. Motors Corp., 908 F.2d 669, 671 (10th Cir.1990) (granting protection to employees who were fired after complaining to management of defects in the installation of brakes in automobiles); Watassek v. Mich. Dep’t of Mental Health, 143 Mich.App. 556, 372 N.W.2d 617, 621 (1985) (upholding wrongful-discharge claim where the employee internally reported the abuse of patients at a mental-health facility), disapproved of on other grounds by Phillips v. Butterball Farms Co., 448 Mich. 239, 531 N.W.2d 144, 146 n. 15 (1995). Other courts have protected employees who have made internal reports to promote workplace safety. See, e.g., Pytlinski v. Brocar Prods., Inc., 94 Ohio St.3d 77, 760 N.E.2d 385, 388 (2002) (protecting an employee who was terminated in contravention of public policy for complaining to the company’s president about several violations of law, including OSHA regulations).

. Adhering to this logic, several other jurisdictions actually require the employee to internally report before making an external report, to afford the employer the opportunity to cure the problem. See, e.g., Wagner v. City of Holyoke, 404 F.3d 504, 509 (1st Cir.2005) (holding that under Massachusetts law, the employee could not bring a claim where he failed to provide written notification to his supervisor before externally reporting misconduct); Dirrane v. Brookline Police Dep't, 315 F.3d 65, 72-73 (1st Cir.2002) (same); Garrity v. Univ. at Albany, 301 A.D.2d 1015, 755 N.Y.S.2d 471, 473 (2003) (rejecting a claim under the New York whistleblower statute where the employee did not give supervisors reasonable time to investigate and correct problems).