**IN THE COURT OF APPEALS OF IOWA**

No. 24-0682
Filed April 9, 2025

**JONATHAN CRITSER,**
        Plaintiff-Appellant,

**vs.**

**CNH INDUSTRIAL AMERICA, LLC, d/b/a CNH INDUSTRIAL, and JOYCE STIMPSON, in her individual and representative capacity,**
        Defendants-Appellees.
_____

        Appeal from the Iowa District Court for Des Moines County, Wyatt Peterson, Judge.

        In his action for discharge in violation of public policy, an employee challenges the district court's instructions to the jury and its grant of his employer's motion for judgment notwithstanding the verdict. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.**

        Leonard E. Bates (argued), Jill M. Zwagerman, and Jacquelyn M. Judickas of Newkirk Zwagerman, P.L.C., Des Moines, for appellant.

        Emily A. McNee (argued) and Susan K. Fitzke of Littler Mendelson, P.C., Minneapolis, Minnesota, for appellees.

        Heard at oral argument by Tabor, C.J., and Schumacher and Chicchelly, JJ.

**TABOR, Chief Judge.**

A jury found that Case New Holland Industrial America L.L.C. (CNH) fired Jonathan Critser in violation of public policy. In the jury's view, Critser engaged in protected conduct when he received unemployment benefits after calling in sick during the COVID-19 pandemic and that conduct was the determining factor in his firing. The jury also decided CNH had neither a good-faith belief that Critser sought benefits to which he was not entitled nor an overriding business justification when it fired Critser. The jury awarded Critser $100,000 in damages.

But the district court granted CNH's motion for judgment notwithstanding the verdict (JNOV). The court found that Critser did not prove that he was engaged in protected conduct when he sought unemployment benefits that he was not entitled to receive. The court reasoned that because Critser called in sick, he was unavailable for work and thus ineligible for benefits. The court also found that he was ineligible for benefits under the federal Pandemic Unemployment Assistance (PUA) program for people who lost work because of COVID-19.

Critser now contests the district court's decision to upend the jury's verdict. He contends that he qualified for benefits under the PUA or, at a minimum, made a good-faith claim for benefits. But under the instructions given to the jury, Critser did not prove by a preponderance of the evidence that he was engaged in protected conduct. Thus, we affirm the district court's JNOV grant.

While we cannot reinstate the verdict, another remedy is proper. Because the district court provided the jury with a faulty definition of protected conduct, we remand for a new trial where the jury may decide whether Critser acted in good faith in making his claim for unemployment benefits.

## I.    Facts and Prior Proceedings

CNH manufactures farming and construction equipment.  Critser started working at its Burlington plant in 2013, moving through several different roles.  His last job involved moving painted tractor parts from a conveyor system.

Critser testified that, at various times of the year—for example, through the summer and holiday production slumps—CNH would lay off its employees, and they would be eligible for unemployment benefits.  Critser collected unemployment benefits in that way a few times before 2020.  CNH's hourly employees were not paid sick leave.  When they were sick, employees called the company's absence reporting line.

In the spring of 2020, the COVID-19 pandemic shuttered the Burlington plant.  During that shutdown, employees could collect unemployment benefits through Iowa Workforce Development (IWD).  Critser filed for weekly benefits during the closure, which lasted roughly from March to July.

In late June, Critser and his fellow employees received letters informing them the plant would reopen in a week.  Along with that letter, the employees received instructions on how the company would handle COVID risks.  For example, the company would check employees' temperatures each morning and enforce distancing measures.  The mailing also instructed employees who felt ill to contact their physician or use the medical services or telehealth resources provided by CNH.  If those health professionals recommended that the employee stay home, the employee was directed to request documentation and contact human resources (HR).  The instructions then provided the phone number for the plant's HR manager, Joyce Stimpson.

When Critser returned to full-time work as scheduled on Monday, July 6, he noticed two prominent signs.  At the factory's entrance hung this sign:



And posted in several places throughout the factory was this sign:



At trial, Critser testified that he was aware of both signs and understood the direction not to enter if he had the listed symptoms.  He also knew to call HR for further instructions if he had those symptoms.

Critser went to work as scheduled on Monday, July 6, and Tuesday, July 7, showing no fever at check-in. But he recalled feeling "off" on Tuesday night and woke up on July 8 feeling exhausted, groggy, and with a mild fever. He suspected he was coming down with COVID. The next day, his symptoms advanced to fever, muscle aches, and fatigue. Because the signs at work instructed employees not to enter the factory with symptoms, he stayed home on Wednesday, July 8 and Thursday, July 9.

As he had done before the pandemic, he called the CNH absence reporting line each day to say he would miss work. He was not scheduled to work on Friday.[1] But the following Monday, because he was feeling better, he returned to the factory. During his absence, he didn't check his temperature, take a COVID test, or contact a medical provider. And he didn't inform anyone at CNH that he had COVID symptoms until after his firing. He only told the absence line he was "sick."

Critser applied for unemployment benefits for the two days he was absent. He testified that he consulted the IWD website for policies on unemployment eligibility and determined that he "could be eligible." He explained:

> It said on there if you're off work for a reason and not a fault of your own that you may be eligible for unemployment benefits, and those signages makes it not my fault because I'm honest on their policy with the signs that someone is giving me the option that I can

---

[1] Critser worked ten-hour shifts, four days per week.

collect unemployment for the two days that I stayed home, so I applied.

He submitted those two days under the same claim he had been using during the shutdown, so CNH did not view it before it went to IWD. IWD approved the claim, finding that Critser was eligible for $861 in benefits.[2]

In early August, Critser received a letter from CNH stating that he was being fired:

> This letter is to inform you[] that your employment with CNH has been terminated effective 8/5/2020. It has been reported to CNH by the State of Iowa, that you filed for unemployment benefits against the CNH account and were paid unemployment benefit[s] the week of 7/6/2020 when you were recalled to fulltime work on 7/6/2020.
> . . . .
> According to the standards of conduct #29 [y]ou are expected not to provide false and/or misleading information to the Company. You are expected to abide by Company policies and to cooperate fully in any investigation the Company may undertake.

At an August 12 meeting with HR manager Stimpson, Critser explained for the first time that he had COVID symptoms on July 8 and 9 and did not come to work because of the signs that told him to stay home. He also offered to repay the $861 in benefits to keep his job. But Stimpson declined to reconsider the termination decision. Stimpson testified that Critser's disclosure at the meeting of COVID symptoms was a "revelation" that confirmed he "misrepresented himself when he received those benefits."[3] Still, CNH did not challenge IWD's grant of his claim for unemployment benefits in administrative proceedings.

---

[2] Critser's normal rate of pay for those two days would have been $360.
[3] Stimpson also criticized Critser for not disclosing his symptoms earlier and "potentially expos[ing] many other employees" to COVID.

After being fired, Critser experienced emotional and personal upheaval, according to his testimony. Losing his job hurt his mental health, exacerbated his substance use, and damaged his relationship with his son.[4] But his unemployment was short-lived; Critser started a new job at Continental, a manufacturing plant in Mount Pleasant, that October.

One year later, Critser sued CNH and Stimpson—alleging one count of wrongful termination in violation of public policy. The petition asserted that CNH retaliated against him for exercising his statutory right to claim unemployment benefits, a protected employee activity. Stimpson moved for summary judgment, which the court denied. Critser then moved for summary judgment, but the court found several genuine issues of material fact that the jury would have to resolve.[5]

The parties tried the case to a jury, which was persuaded by Critser's position. In a series of interrogatories, the jury found:

> 1. Critser engaged in protected conduct when he sought unemployment benefits.
> 2. Stimpson and CNH did not have a good-faith belief that Critser knowingly sought unemployment benefits to which he was not entitled and this was not the determining factor in his termination.
> 3. Critser's protected conduct was the determining factor causing his termination.
> 4. CNH did not have an overriding business justification for terminating Critser.
> 5. Critser appropriately mitigated his damages.

And the jury awarded Critser $100,000 for mental pain and suffering going back to the date of his termination, but no damages for future pain and suffering.

---

[4] Critser also offered testimony about the fallout from his son, brother, and sister.
[5] These included "what is the true reason CNH fired Critser?", "[w]as it because he filed for unemployment benefits" or "because he failed to follow proper procedure when calling in sick and instead sought unemployment in a fraudulent manner," and whether CNH had an overriding business justification for the termination.

CNH moved for JNOV, or for new trial and remittitur, arguing that the verdict was contrary to the weight of the evidence and inflammatory comments from Critser's counsel during closing argument persuaded the jury to decide on an improper basis. The court granted CNH's motion JNOV, finding the record did not support the jury's finding that Critser was engaged in protected conduct. From there, the court dismissed Critser's petition. Critser appeals.[6]

## II. Scope and Standards of Review

We review the JNOV grant for the correction of errors at law. *Clark v. State*, 7 N.W.3d 740, 749 (Iowa 2024). When considering a JNOV motion, the district court must view the evidence in the light most favorable to Critser. *Id.* In doing so, it must afford him every legitimate inference that may be reasonably deduced from the record. *Id.* We consider the evidence in the same manner as the district court, asking whether there was sufficient evidence to generate a jury question. *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998).

We also review Critser's challenge to jury instructions for the correction of legal error. *See State v. Johnson*, 7 N.W.3d 504, 510 (Iowa 2024).

## III. Analysis

Iowa recognizes the tort of wrongful discharge in violation of public policy. *Koester v. Eyerly-Ball Cmty. Mental Health Servs.*, 14 N.W.3d 723, 729 (Iowa 2024). This cause of action is a narrow exception to the rule that either party may end an employment relationship "at any time, for any reason, or no reason at

---

[6] Critser's brief asks for one of three remedies: (1) grant his motion for summary judgment; (2) reverse the JNOV, reinstate the jury award and remand for new trial on punitive damages; or (3) find the court erred in instructing the jury and remand for a new trial on liability and damages.

all." *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 300 (Iowa 2013) (citation omitted). This exception prevents employers from coercing employees to give up certain statutory rights. *Lara v. Thomas*, 512 N.W.2d 777, 782 (Iowa 1994).

To prevail on his tort claim, Critser had to prove four elements: (1) the existence of a clearly defined and well-recognized public policy that protected his conduct; (2) that the public policy would be undermined by CNH's decision to fire him; (3) that he engaged in the protected conduct, which was the reason he was fired; and (4) that CNH had no overriding business justification for the discharge. *Id.* The first two elements are legal questions for the court. *Id.*

On the first element, there's no question that seeking unemployment benefits can be protected conduct. *Id.* But this case has a twist not presented in *Lara*. In *Lara*, it was undisputed that the employee was eligible for partial unemployment benefits after the employer reduced her hours. *Id.* at 780. But here, a question loomed whether Critser was eligible for benefits for his two-day COVID-19 absence. CNH insisted that Critser was engaged in protected conduct *only* if he was eligible for the benefits sought. In contrast, Critser argued it was enough for him to show a good-faith belief that he was eligible when he applied to IWD and received unemployment benefits.

Over Critser's objection, the court advised the jury that an employee engages in protected conduct "by seeking unemployment benefits to which the employee is entitled," and "[a]n employee who has made a claim for unemployment benefits to which the employee is entitled has engaged in protected activity." But, according to that jury instruction: "[a]n employee who has made a claim for

unemployment benefits to which the employee is not entitled has not engaged in protected activity."

The court also instructed the jury that an unemployed individual is "eligible to receive unemployment benefits . . . *only if* . . . [t]he individual is able to work, is available for work, and is earnestly and actively seeking work," or if the individual is "employed at the individual's then regular job and available for work," "works less than the regular full-time week" for that week, and "earns less than the individual's weekly benefit amount plus fifteen dollars." (Emphasis added). In any case, "[a]n individual who is ill and not able to perform work due to illness is not considered available for work."

During the COVID-19 pandemic, the Coronavirus Aid, Relief, and Economic Security (CARES) Act allowed unemployment benefits if the applicant's work was affected by the pandemic under some circumstances. Those complex provisions were summarized in a jury instruction explaining that PUA benefits were available to some employees who were otherwise ineligible for unemployment benefits under their governing state law. Such employees had to certify that they were "otherwise able to work and available for work" and "unemployed, partially unemployed, or unable or unavailable to work because" of one of ten COVID-related circumstances.

Three scenarios were potentially relevant to Critser:

> (a) the individual has been diagnosed with COVID-19 or is experiencing symptoms of COVID-19 and seeking a medical diagnosis;
> . . . .
> (f) the individual is unable to reach the place of employment because the individual has been advised by a health care provider to self-quarantine due to concerns related to COVID-19;
> (g) the individual was scheduled to commence employment and does not have a job or is unable to reach the job as a direct result of the COVID-19 public health emergency.

The court further instructed that employees were ineligible for PUA benefits if they were "receiving paid sick leave or other paid leave benefits," even if they met any of the qualifications described.

Despite the court siding with CNH on how to define protected conduct for the jury, the jury returned a verdict for Critser. But the court did not allow the verdict to stand, finding "under the instructions given, Mr. Critser did not engage in protected conduct."

On appeal, Critser attacks the district court's rulings on two fronts.[7] First, he contests the JNOV grant. He contends the court did not view the facts in the light most favorable to him. *See Larsen v. United Fed. Sav. and Loan Ass'n of Des Moines*, 300 N.W.2d 281, 283 (Iowa 1981). On that contention, Critser argues the court ignored the "reasonable conclusion" that he qualified for benefits under PUA's paragraph (g).[8] He claims that given the signs posted by CNH restricting plant access to people with symptoms, he was "unable to reach the job as a direct

---

[7] In his appellant's brief, Critser challenged both the denial of his motion for summary judgment and the grant of JNOV. But at oral argument, his counsel conceded that the first claim is subsumed under the JNOV issue.
[8] Although the district court also assessed paragraphs (a) and (f), Critser advances no substantive argument on those criteria on appeal.

result of the COVID-19 public health emergency." Critser also emphasizes that IWD awarded him benefits and he was never asked to repay them.

On the administrative law question, we agree with CNH that IWD's payment of benefits was not dispositive, and the employer did not need to litigate the validity of Critser's unemployment claim to defend itself in the wrongful termination action. *See Caras v. Fam. First Credit Union*, 688 F. Supp. 586, 590 (D. Utah 1988) (finding defendants did not have an incentive to litigate the issue in administrative proceedings "as the only adverse effects to the defendants would be payment of unemployment compensation, a minimal amount compared to the amount in controversy in this case").

Returning to the PUA benefits, we find no error in the district court's grant of JNOV. As the jury instructions defined protected conduct, substantial evidence did not support Critser's claim that he was entitled to unemployment benefits. *See White v. State*, 5 N.W.3d 315, 323 (Iowa 2024) (viewed in the light most favorable to the nonmoving party, sufficient evidence must justify submitting the case to the jury). The evidence shows that Critser was sick on July 8 and 9 and informed CNH of his illness on the absence reporting line. As CNH argues, because Critser was sick those two days and not available for work, he was ineligible for unemployment benefits under the state *and* federal provisions. Iowa Code § 96.4(3)(a) (2020); 15 U.S.C. § 9021(a)(3)(A)(ii)(I) (2020). So we cannot restore the verdict.[9]

Failing a reversal of the JNOV grant, Critser moves to a second front. He argues that the court provided the jury with a faulty definition of protected conduct.

---

[9] Because we affirm the JNOV grant, we need not reach Critser's argument on punitive damages.

He maintains that the correct inquiry was not whether he was eligible for unemployment benefits but whether he had a good-faith belief that he was eligible. He relies on *Teachout v. Forest Community School District*, where the Iowa Supreme Court reasoned that a teaching assistant's good-faith intent to report child abuse could be considered protected conduct. 584 N.W.2d 296, 301 (Iowa 1998).

CNH counters that *Teachout* stands for the proposition "that employees need only have a good faith basis for reporting illegal or fraudulent actions" to engage in protected conduct. By contrast, CNH argues, filing false and misleading benefit applications is not protected activity. It cites a federal case to emphasize that the wrongful-discharge tort is "not designed to protect employees making false claims or false representations." *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F. Supp. 2d 981, 1036 (S.D. Iowa 2006), *aff'd*, 505 F.3d 800 (8th Cir. 2007). At bottom, CNH defends the definition given to the jury that employees engage in protected activity only when filing for benefits to which they are entitled.

In reply, Critser points to this holding in *Lara*: "[R]etaliatory discharge of an employee who *files* a claim for partial unemployment benefits 'serves to frustrate a well-recognized and defined public policy of the state.'" 512 N.W.2d at 782 (emphasis added) (quoting *Springer v. Weeks & Leo Co.*, 429 N.W.2d 558, 560 (Iowa 1988)); *see also Koester*, 14 N.W.3d at 730 ("Koester wasn't discharged for engaging in statutorily protected activity, such as claiming unpaid wages, filing an unemployment claim, or filing a workers' compensation claim."). Critser stresses: "If the goal is to enforce a statutory right to file for unemployment benefits, it would

make little sense for protection from employer retaliation to extend only to those employees who happen to have a successful partial unemployment claim."

Critser overstates his point. We don't read *Lara* as concluding that *any* filing for unemployment benefits—no matter how fraudulent—would be the exercise of a protected right. But CNH also goes too far. Not every unsuccessful claim for benefits should subject a worker to retaliatory discharge. *See Napreljac*, 505 F.3d at 803 (distinguishing between "false" claims and those that are just not compensable).

The law rests in the middle. In *Lara*, our supreme court highlighted the legislature's declaration that economic insecurity from unemployment poses a "serious menace" to the welfare of Iowans. 512 N.W.2d at 782 (quoting Iowa Code § 96.2 (1989)). From there, the court found that "permitting an employer to indirectly force an employee to give up" the statutory right to seek unemployment benefits would have a chilling effect on the exercise of that right. *Id.* Those economic security protections advanced in *Lara* would apply equally to employees entitled to unemployment benefits and to employees who in good faith believed they were entitled to unemployment benefits. *Cf. Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 287 (Iowa 2000) (viewing good-faith intent to engage in protected activity, for example, giving truthful testimony, the same as actually engaging in that protected activity).

Further, the supreme court has found "it is also against public policy to discharge an employee solely on the employer's subjective judgment as to the bona fides of a pending claim" because "there may be situations where a workers' compensation claim is ultimately unsuccessful" but discharging the employee

"based on the filing of the claim would violate public policy." *Springer*, 429 N.W.2d at 562. The employer's assertion that the employee filed a "groundless and false workers' compensation claim . . . can be viewed as reinforcing [the employee's] contention that the filing" of the claim was the reason for the termination. *Id.*

The statutes and regulations governing unemployment compensation are "complex" and the "conditions for benefit entitlement" are not always clear, even for seasoned legal and HR professionals. *Hart v. Iowa Dep't of Job Serv.*, 394 N.W.2d 385, 388 (Iowa 1986). Those complexities were only compounded by the special allowances for benefits during the pandemic.[10] Charging employees acting in good faith with a perfect understanding of those complexities would chill the exercise of their statutory rights, as *Lara* cautioned. *See* 512 N.W.2d at 782.

Given these considerations, the jury instruction's definition of protected conduct was too narrow. The district court should have instructed the jury that Critser engaged in protected conduct if he applied for unemployment benefits with the good-faith belief that he was entitled to receive them. *See Carter v. Lee Cnty.*, No. 13-1196, 2015 WL 161833, at *8 (Iowa Ct. App. Jan. 14, 2015) (citing *O'Brien v. Emp. App. Bd.*, 494 N.W.2d 660, 662 (Iowa 1993), which equates a claimant's good-faith defense with an objective reasonable belief standard).

Having found an erroneous and prejudicial jury instruction, we must settle on the remedy. As his favored route, Critser insists that we can just reinstate the

---

[10] Critser testified that he answered the questions on the unemployment claim form as honestly as he could. He told the jury that he believed he was available for work on July 7 and 8, recounting that before the pandemic he still went to work when he was sick. But the signs at the plant during the pandemic prevented him from working because they directed him not to enter with COVID symptoms.

verdict. He argues that "where an errant jury instruction makes it more difficult for a party to prove their case, yet they prevail at trial anyway, Iowa's appellate courts have held that instructional error to be harmless." *See Rivera v. Woodward Res. Ctr.,* 865 N.W.2d 887, 903 (Iowa 2015). As its fallback position, CNH contends that if we reject the district court's definition of protected conduct, it is entitled to a new trial where the jurors would decide whether Critser acted in good faith. We agree with the course urged by CNH. The harmless-error principle mentioned in *Rivera* does not apply here. The faulty definition of protected conduct made it impossible for Critser to prevail on this record. That is why we are affirming the JNOV grant. This case must go back for retrial so that the jury can consider the correct definition of protected conduct.[11]

To recap, we affirm the district court's grant of JNOV, we reverse the court's ruling on the jury instructions, and we remand for a new trial.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR NEW TRIAL.**

---

[11] We decline to address Critser's claim that the district court abused its discretion by excluding evidence of an alleged pattern of disregard for the rights of employees through the testimony and text chains of former coworkers. The record will be different on retrial and the question will arise, if at all, in new context. *See Sauer v. Scott,* 176 N.W.2d 140, 145 (Iowa 1970).