# In the Iowa Supreme Court

No. 24–0346

Submitted April 15, 2025—Filed May 23, 2025

**Kelly Brodie, John Heffron, Katherine King, Michael Langenfeld,** and **Katherine Rall,**

Appellants,

vs.

**Jerry R. Foxhoven, Richard Shults, Jerry Rea, Mohammad Rehman, Glenwood Resource Center,** and **Iowa Department of Human Services,**

Appellees.

Appeal from the Iowa District Court for Mills County, Craig M. Dreismeier, judge.

Five employees appeal a district court decision granting summary judgment against the employees' wrongful-discharge claims. **Affirmed.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Dwyer Arce (argued), Natalie A. Pieper (until withdrawal), and Amy L. Van Horne (until withdrawal) of Kutak Rock LLP, Omaha, Nebraska, for appellants.

Brenna Bird, Attorney General; Eric H. Wessan, Solicitor General; Breanne A. Stoltze (argued), Assistant Solicitor General; and Adam Kenworthy and Ryan P. Sheahan, Assistant Attorneys General, for appellees.

Gary Dickey of Dickey, Campbell & Sahag Law Firm, P.L.C., Des Moines, for amicus curiae VOR, Inc.

**Mansfield, Justice.**

**I. Introduction.**

This case arises out of the disturbing events at the now-closed Glenwood Resource Center (GRC). GRC was a residence for persons with severe intellectual and developmental disabilities (IDD). Beginning in late 2017, the superintendent of GRC planned and carried out experiments on residents without their consent. These included a "hydration" experiment, where vulnerable residents were given fluids in excess of what had been medically recommended to determine if this would reduce the incidence of pneumonia.

The five plaintiffs in this case are former *employees* who left GRC while this experimentation was going on. Each had a somewhat different job, and each departed GRC under somewhat different circumstances. They have sued the Iowa Department of Human Services (DHS), the former director of DHS, the former director of the division of mental health and disability services in DHS, GRC, and the superintendent and medical director of GRC who were involved with the human experimentation.[1] They originally alleged claims of wrongful discharge in violation of public policy, conspiracy for wrongful discharge, violation of Iowa Code section 70A.28 (2020), and tortious interference with the physician–patient relationship. All of the claims were eventually dismissed by the trial court, and the plaintiffs have appealed only the summary judgment against them on the wrongful-discharge public-policy claim.

On appeal, we affirm the district court's grant of summary judgment for two reasons. First, we conclude that the plaintiffs failed to demonstrate that any of them was terminated for vindicating a "clearly defined public policy" as

---

[1]DHS officially became the Iowa Department of Health and Human Services on July 1, 2023. This case was brought before the organizational restructuring. Accordingly, we refer to the department as "DHS" throughout this opinion.

required for the wrongful-discharge public-policy tort. Second, as we explain below, the plaintiffs' claims are essentially whistleblower claims, and we conclude that section 70A.28 provides the exclusive path for state employees to pursue whistleblower claims. The plaintiffs pursued that path, the district court granted summary judgment there as well, and the plaintiffs have not appealed that grant of summary judgment.

**II. Facts and Procedural History.**

**A. Glenwood Resource Center.**[2] GRC, located in the county seat of Mills County, was operated for many years by the State of Iowa as a residence for persons with IDD. During the time period relevant to this case, more than 200 people lived at GRC.

In 2004, the State entered into a consent decree with the United States Department of Justice (DOJ), based on the DOJ's determination that "persons residing in or confined to . . . [GRC] were being subjected to conditions that deprived them of their legal rights and of their rights, privileges, and immunities secured by the Constitution of the United States." The consent decree imposed various care requirements on GRC until it was formally lifted in 2010. Thereafter, many of those requirements were incorporated into the GRC employee manual.

**B. Unconsented Human Experimentation at GRC.** In September 2017, Dr. Glen Rea—a child psychologist who had been superintendent of a state-operated residential facility in Kansas for persons with intellectual disabilities—joined GRC as its new superintendent. By December, Dr. Rea had begun implementing an experiment on how to treat people with pneumonia, one of the leading causes of death for people with IDD. Dr. Rea's theory was that

---

[2]Because this is an appeal from a grant of summary judgment, we recite the facts in the light most favorable to the plaintiffs.

increasing a person's fluid intake would help reduce the incidence of pneumonia. GRC identified nine patients to be the "trial group." Eight of the nine in the trial group were being tube-fed. GRC increased the group's fluid intake well beyond what GRC's registered dieticians recommended. One of the patients received fifty-eight percent more fluids than recommended. GRC later expanded the experiment to include a second group of residents.

During the experiment, one of the test patients was hospitalized several times with symptoms of heart failure, which can be caused by overhydration. Another patient experienced vomiting, leading to hospitalization three times within the four-month period after the experiment began. Neither was removed from the experimental program. One resident died while participating in the hydration program.

Dr. Rea also implemented a number of behavioral health experiments. In May 2018, Dr. Rea directed the purchase of software and equipment for "Approach Avoidance Task" (AAT) training to be used to treat "problematic behaviors." During AAT, a patient would sit down with a computer screen and a joystick and be shown "positive" and "negative" images with instructions to pull the joystick away from the negative images and toward the positive images. As part of AAT for sexual behavior, Dr. Rea acquired a set of computer-generated images of clothed and nude children. GRC also purchased silk sheets, silk boxers, and lubricants for the patients to masturbate with. At a meeting, Dr. Rea explained that this purchase was in furtherance of his research program.

No patient (nor anyone on their behalf) consented to be a part of these experiments. They were conducted without normal safeguards such as oversight and approval by an institutional review board. Some patients' medications were altered to facilitate their participation in these experiments.

**C. The Investigation and Closing of GRC.** GRC had other significant issues under Dr. Rea's leadership. The use of physical patient restraints increased dramatically. So did the mortality rate.

In November 2019, the DOJ opened a new on-site investigation into GRC. Soon thereafter, Dr. Rea was fired. In December 2020, the DOJ issued a scathing report on conditions at GRC under Dr. Rea's leadership. The report concluded,

> DOJ has reasonable cause to believe that the State fails to protect residents from harm, including by conducting unregulated experiments on human subjects, failing to provide constitutionally adequate medical and behavioral health care at [GRC], and utilizing unnecessary physical restraints, all of which have subjected residents to serious harms and risks of harm.

In 2022, the State began the process of closing GRC, and it was officially closed with all residents moved out by June 2024.

**D. The Plaintiffs and Their Job Histories at GRC.** Plaintiffs Kelly Brodie, Dr. John Heffron, Katherine King, Dr. Michael Langenfeld, and Katherine Rall were employed at GRC as of September 2017 when Dr. Rea became superintendent. Each of them left the institution at some point in 2018 when the human experimentation was going on.

1. *Brodie.* Brodie joined GRC in 2003 and served as assistant superintendent until she resigned in October of 2018. Brodie did not get along with Dr. Rea and claimed that he made her daily work life difficult. Dr. Rea removed Brodie from management meetings she had previously attended as part of his effort to assume greater managerial control over GRC.

Brodie complained to others about Dr. Rea's conduct on several occasions. She complained to Rick Shults, who was at the time director of the division of mental health and disability services within DHS and Dr. Rea's boss. Brodie told Shults that Dr. Rea had misspent taxpayer dollars by making unapproved

renovations to the superintendent's residence at GRC and by conducting unauthorized research projects on patients. She also told Shults that Dr. Rea was verbally harassing her. She made written and oral complaints to the United States Department of Labor about the harassment and the hostile work environment at GRC. She told an Iowa Occupational Safety and Health Administration investigator that she had been discriminated against and had been harassed in retaliation for her various complaints.

Brodie was aware of the human experiments occurring at GRC but was not involved in them. She participated in executive meetings where the pneumonia group was discussed. She had no input or involvement with the actions of the pneumonia group other than attending those meetings and expressing concerns. She was also made aware of the behavior experiments through executive meetings. When the purchase of silk sheets, silk boxers, and lubricants was submitted to her for electronic approval, she discussed how the purchase should be coded with the purchasing officer and then approved it. Other than approving the purchases and attending meetings, Brodie was not involved with the behavioral research.

Brodie resigned in October 2018. She alleged that she was "forced to leave GRC due to the hostile environment."

2. *Dr. Heffron.* Dr. Heffron was hired by GRC in May 2009 as a staff physician responsible for the primary care of a panel of patients and for monitoring and handling urgent care needs for the facility overall. He continued to work at GRC in this capacity until he was suspended with pay in December 2017 and then terminated in March 2018.

Dr. Heffron participated in an introductory meeting where Dr. Mohammad Rehman, GRC's medical director, first discussed the hydration experiment for

pneumonia. Dr. Rehman was "kind of vague" about it. Dr. Heffron, along with other members of the medical staff, objected to the program. As Dr. Heffron put it, "I didn't understand what the point of another meeting was going to be . . . because I thought that our monthly pneumonia meetings were comprehensive and I didn't see what the point would be." Other than this initial presence when the formation of a pneumonia group was discussed, Dr. Heffron was unaware of the experiments at GRC. In Dr. Heffron's words: "[O]ther than the initial meeting, I was not involved. I was gone."

While working under Dr. Rea, Dr. Heffron was criticized for the number of diagnostic tests he ordered, the amount of medication he prescribed, and his orders to hospitalize patients in emergency situations. Dr. Rea repeatedly demanded that Dr. Heffron cut back on the use of these tools and treatments. Dr. Heffron refused to do so and continued to respond to his patients' medical needs in the same manner as before.

Dr. Heffron also had concerns about the quality of care that Dr. Rea was providing. On one occasion, Dr. Rea failed to follow up with a patient who had a fever. When Dr. Heffron saw the patient a few days later, the patient required hospitalization. Dr. Heffron complained about this incident to the director of quality assurance at DHS, who forwarded the complaint to Shults. Shults chastised Dr. Heffron for making the report and gave Dr. Heffron the impression that he'd be in trouble if he continued to pursue the matter.

Dr. Rea fired Dr. Heffron in March 2018. When Dr. Heffron asked why he was being terminated, Dr. Rea refused to give any specific reasons.

3. *King.* King began working for GRC in 1975 as a social worker. She was subsequently promoted to treatment program manager in 1986 and continued

in that capacity until she retired in March 2018. As a treatment program manager, she supervised a team of doctors, nurses, and support staff.

King did not have a good relationship with Dr. Rea. She had multiple meetings with him where he expressed that she was not doing her job properly and was not getting in line with his recommendations. Because of these meetings, King was concerned that she would likely be fired.

King also disagreed with Dr. Rea's decision to purchase a restraint apparatus for one patient and to allow the use of restraints on that patient. King was concerned that the decision to permit the use of restraints could potentially lead to a culture where it became "acceptable to hold people for extended periods of time."

In February 2018, shortly before she retired, King reported her misgivings about the use of restraints to Jerry Foxhoven, then director of DHS.

King alleges that she retired "as a result of the hostile work environment." Following her retirement, King contacted additional individuals to raise concerns, including an employee of Disability Rights Iowa and a member of the Iowa General Assembly. King does not claim to have been aware of or to have complained about the human experiments at GRC.

4. *Dr. Langenfeld.* Dr. Langenfeld was hired at GRC in 2008 as a staff physician responsible for the primary care of a panel of patients and for monitoring and handling urgent care needs for the facility overall.[3] He continued to work at GRC in that capacity until he resigned in March 2018. In 2020, Dr. Langenfeld returned to work at GRC as an independent contractor physician at the request of the director of DHS.

---

[3]Dr. Langenfeld recruited Dr. Heffron to work at GRC in 2009, the year after Dr. Langenfeld himself joined GRC.

Dr. Langenfeld disagreed with some of the medical and leadership decisions made by GRC's medical director, Dr. Rehman. He strongly objected to Dr. Rehman's decision to hire a pediatrician at GRC to fill a role that required, in his view, a neurologist. Also, he felt that the pediatrician had made misrepresentations on his CV. Following this hiring decision, Dr. Langenfeld and other medical staff (including Dr. Heffron) delivered a vote of no confidence in Dr. Rehman to Dr. Rea. While still employed at GRC, Dr. Langenfeld also brought these concerns to the attention of Foxhoven, the Iowa Board of Medicine, and an investigator with the Iowa Department of Inspections and Appeals.

In addition, Dr. Langenfeld complained that Dr. Rehman consistently arrived late to work, was rude to other doctors, and generally had a style of leadership that Dr. Langenfeld did not agree with.

Dr. Langenfeld attended the initial meeting proposing the creation of the hydration pneumonia group. He disagreed with the formation of the group and complained about the plan to both Dr. Rea and Dr. Rehman after the meeting. He and Dr. Heffron agreed that the study was not applicable to their residents. Following that initial meeting, Dr. Langenfeld had no further involvement in the pneumonia group, though when he rejoined GRC in 2020, he became aware that further meetings had been carried out and that the plan had been implemented.

In March 2018, Dr. Langenfeld resigned because there were some "issues of hostility" at GRC, and he didn't want it to jeopardize his record.

5. *Rall.* Rall came to work at GRC as the director of quality management in 2006 and continued in that capacity until she resigned in February 2018.

One of Rall's duties as the director of quality management was the supervision of GRC's training department. In October 2017, shortly after Dr. Rea became superintendent at GRC, he informed her that he would be shifting the

supervision of the training department from quality management to human resources. Rall objected to this change, pointing out that it would result in a reduction in her salary. During the meeting at which the change in responsibilities was discussed, Dr. Rea made a comment that a medication he was taking was causing him to suffer hot flashes. He then related that he had told his wife he now understood what women were going through, but that his condition was "worse." This comment made Rall believe that maybe she was being discriminated against for being a middle-aged woman. Following the meeting, Rall alleges she was harassed and retaliated against for resisting the change.

In November, Rall was placed on paid administrative leave with no explanation given. In February 2018, shortly before she resigned, Rall made written complaints about Dr. Rea to the Iowa Department of Administrative Services and Foxhoven. The complaints concerned Dr. Rea's management style, his failure to follow policies, and his behavior at the October 2017 meeting. Soon thereafter, believing there was no way she could return and continue working with Dr. Rea, Rall resigned. Prior to her resignation, Rall had no knowledge of any human experiments taking place at GRC.

**E. This Litigation.** This action was originally filed in February 2020 in federal district court and included claims under 42 U.S.C. § 1983 and the First Amendment as well as state law claims. After the federal district court granted a motion to dismiss the federal claims with prejudice, it dismissed the state law claims without prejudice, *see* 28 U.S.C. § 1367(c)(3), relegating the plaintiffs to state court to pursue those claims.

Thus, on November 6, the plaintiffs Brodie, Dr. Heffron, King, Dr. Langenfeld, and Rall refiled in the Mills County District Court against

Foxhoven, Shults, Dr. Rea, Dr. Rehman, GRC, and DHS.[4] Count I asserted claims for wrongful termination in violation of public policy, count II asserted claims for conspiracy for wrongful termination in violation of public policy, and count III asserted claims for violation of the whistleblower statute set forth in Iowa Code section 70A.28.[5] Dr. Heffron and Dr. Langenfeld also brought a fourth count for tortious interference with the physician–patient relationship.

The defendants responded with a pre-answer motion to dismiss counts I, II, and IV. They maintained that count I was barred because section 70A.28 provided an exclusive remedy. They also contended that count II was foreclosed because state employees being sued in their official capacity could not legally conspire with each other and that count IV was foreclosed because Iowa does not recognize a cause of action for tortious interference with the physician–patient relationship. The district court granted the motion as to counts II and IV but denied it as to count I, reasoning that "Iowa courts have been less than clear on the exclusivity of Section 70A."

**F. The Defendants' Motion for Summary Judgment on the Wrongful Termination in Violation of Public Policy Claim.** For the next year, the parties mostly engaged in written discovery. In November 2022, the defendants moved for summary judgment on count I—the wrongful discharge in violation of public policy claim. This time, the defendants argued not only that section 70A.28 was the exclusive remedy, but also that the plaintiffs had failed to identify a well-recognized and clearly defined public policy.

---

[4]A sixth plaintiff, Jamie Shaw, was originally part of the litigation, but she has not appealed the dismissal of her claims.

[5]It is not disputed that Dr. Rea terminated Dr. Heffron's employment. Brodie, King Dr. Langenfeld, and Rall alleged that they had been constructively discharged.

The plaintiffs' petition alleges that the termination or constructive termination of the plaintiffs "violate[d] well-established public policy of the State of Iowa as defined by statute, regulation and judicial decision, which public policy would be undermined and jeopardized under the circumstances of the case." When asked in interrogatories to "[i]dentify the well-recognized and defined public policy that supports your claim," the plaintiffs made general references to "[l]aws and policies," including "[l]aws and policies regarding improper experimentation on GRC residents in violation of state and federal law." In moving for summary judgment, the defendants argued that the plaintiffs "must point to a well-recognized and clearly defined public policy and cannot rely on vague and generalized assertions of laws and policies."

The plaintiffs' resistance countered that "[p]rotecting GRC's residents [was] a clearly defined and well-recognized public policy." Their resistance also cited two statutes: Iowa Code sections 225C.1(2) and 230A.101(1). Those statutes provide, respectively, as follows:

> It is the intent of the general assembly that the service system for persons with disabilities emphasize the ability of persons with disabilities to exercise their own choices about the amounts and types of services received; that all levels of the service system seek to empower persons with disabilities to accept responsibility, exercise choices, and take risks; that disability services are individualized, provided to produce results, flexible, and cost-effective; and that disability services be provided in a manner which supports the ability of persons with disabilities to live, learn, work, and recreate in communities of their choice.

Iowa Code § 225C.1(2).

> The role of the department as the state mental health authority with responsibility for state policy concerning mental health and disability services, is to develop and maintain policies for the mental health and disability services system. The policies shall address the service needs of individuals of all ages with disabilities in this state, regardless of the individuals' places of residence or economic

circumstances, and shall be consistent with the requirements of chapter 225C and other applicable law.

*Id.* § 230A.101(1).

On the question of whether section 70A.28 contained an exclusive remedy, the plaintiffs responded that their wrongful-discharge claims were based on "numerous other actions" besides whistleblowing.

In January 2023, the district court granted summary judgment dismissing count I. It did so on the first ground, without reaching the second. The district court reasoned that the plaintiffs needed to do more than make "vague references to the standards and laws governing GRC management." The district court also held that the foregoing two statutory provisions were too "vague and generalized" to allow for wrongful-termination claims:

> In their resistance to this motion, Plaintiffs . . . claim that Iowa Code §§ 225C.1(2) and 230A.101(1) provide a clearly defined public policy to protect GRC's residents from abuse. . . . However, neither of the two referenced statutory provisions in this case is obligatory or prohibitive in nature. They do not impose a statutory duty on Plaintiffs to oppose or report Defendants' actions at GRC, and they do not make Defendants' alleged actions at GRC unlawful. In addition, the Iowa Code sections referenced here are neither statutes "expressly mandating protection for at-will employees" nor statutes "defin[ing] clear public policy [and] imply[ing] a prohibition against termination from employment to avoid undermining that policy."

(Quoting *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, 835 N.W.2d 293, 303 (Iowa 2013).)

**G. The Defendants' Motion for Summary Judgment on the Section 70A.28 Claim.** Following this ruling, the parties engaged in additional discovery. In August 2023, the defendants moved for summary judgment on the last remaining count—count III. This motion addressed each plaintiff sequentially, arguing that each plaintiff either had not made a qualifying

disclosure under section 70A.28 or had not suffered an adverse employment action in retaliation. The plaintiffs resisted this motion and, following a hearing, the district court granted it on February 1, 2024.

The plaintiffs have appealed, challenging only the summary judgment ruling on count I. We retained the plaintiffs' appeal.

**III. Standard of Review.**

Summary judgment should be granted when the record shows no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). "When examining the record, the court views it in a light most favorable to the nonmoving party." *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 228 (Iowa 2004). "Whether a public policy against discharge exists is a question of law appropriately decided on a motion for summary judgment." *Id.*

**IV. Analysis.**

**A. The Wrongful Discharge in Violation of Public Policy Tort.** "Iowa is an at-will employment state. This means that, absent a valid contract of employment, 'the employment relationship is terminable by either party "at any time, for any reason, or no reason at all." ' " *Berry v. Liberty Holdings, Inc.*, 803 N.W.2d 106, 109 (Iowa 2011) (quoting *Fitzgerald v. Salsbury Chem., Inc.*, 613 N.W.2d 275, 280 (Iowa 2000) (en banc)). Yet there are outer boundaries to this doctrine. *Id.* "The public-policy exception to the at-will employment doctrine limits an employer's discretion to discharge an at-will employee when the discharge would undermine a clearly defined and well-recognized public policy of the state." *Id.*

To prevail on an intentional tort claim of wrongful discharge in violation of public policy, an employee must prove four elements:

> (1) the existence of a clearly defined and well-recognized public policy that protects the employee's activity; (2) this public policy would be undermined by the employee's discharge from employment; (3) the employee engaged in the protected activity, and this conduct was the reason the employer discharged the employee; and (4) the employer had no overriding business justification for the discharge.

*Koester v. Eyerly-Ball Cmty. Mental Health Servs.*, 14 N.W.3d 723, 729 (Iowa 2024) (quoting *Carver-Kimm v. Reynolds*, 992 N.W.2d 591, 598 (Iowa 2023)). "The first two elements involve questions of law for the court to decide." *Id.* (quoting *Carver-Kimm*, 992 N.W.2d at 598).

We have repeatedly emphasized that the public-policy exception to the general rule of at-will employment is narrow. *Id.*; *see also Halbur v. Larson*, 14 N.W.3d 363, 374 (Iowa 2024); *Carver-Kimm*, 992 N.W.2d at 602; *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 144 (Iowa 2013); *Berry*, 803 N.W.2d at 109; *Ballalatak v. All Iowa Agric. Ass'n*, 781 N.W.2d 272, 275 (Iowa 2010); *Jasper v. H. Nizam, Inc.*, 764 N.W.2d 751, 762 (Iowa 2009); *Fitzgerald*, 613 N.W.2d at 283. "An employer's right to terminate an employee at any time only gives way under the wrongful discharge tort when the reason for the discharge offends clear public policy." *Fitzgerald*, 613 N.W.2d at 283.

" 'The legislature is the branch of government responsible for advancing public policy,' and 'we have consistently rejected claims of wrongful discharge based on public policy when the public policy asserted by an employee was not derived from a statute.' " *Koester*, 14 N.W.3d at 731 (quoting *Jasper*, 764 N.W.2d at 762–63). In the context of the common law wrongful-discharge tort, a public policy is clearly defined and well recognized only when it is "clearly articulated by a statute or other appropriate source." *Fitzgerald*, 613 N.W.2d at 285. As we have said,

In first recognizing the public policy exception to the at-will employment doctrine, we were careful to limit the tort action for wrongful discharge to cases involving only a well-recognized and clear public policy. . . . This important element sets the foundation for the tort and it is necessary to overcome the employer's interest in operating its business in the manner it sees fit.

*Id.* at 282 (citation omitted).

An important case in this area is *Lloyd v. Drake University*, 686 N.W.2d 225. There we rejected a university security guard's claim that he had been wrongfully discharged in violation of public policy. *Id.* at 226. The guard was fired after using force to subdue an individual on campus who he believed was assaulting another person. *Id.* at 227. He claimed that he had been wrongfully terminated "simply for upholding the criminal laws of the state." *Id.* at 226. We affirmed the district court's grant of summary judgment, reasoning,

We have little quarrel . . . with one of the basic premises of Lloyd's argument: namely, that the criminal laws of the state reflect a general public policy against crime and in favor of the protection of the public. That said, the public policy asserted here is far too generalized to support an argument for an exception to the at-will doctrine. In short, the public policy is not *clearly defined.* Apart from a vague reference to the whole of the criminal law, Lloyd cites no statutory or constitutional provision to buttress his claim. Divorced from any such provision or equivalent expression of public policy, we cannot find a well recognized and clearly defined public policy in such vague generalizations.

*Id.* at 230. We echoed an earlier case's warning that "[a]ny effort to evaluate the public policy exception with generalized concepts of fairness and justice will result in an elimination of the at-will doctrine itself" and "could unwittingly transform the public policy exception into a 'good faith and fair dealing' exception, a standard we have repeatedly rejected." *Id.* (quoting *Fitzgerald*, 613 N.W.2d at 283).

Another significant case is *Carver-Kimm v. Reynolds*, 992 N.W.2d 591. There the public information officer for a state department alleged that she had

been fired "after she made repeated efforts to comply with Iowa's Open Records law (Chapter 22) by producing documents and information to local and national media." *Id.* at 598. She argued that Iowa Code section 22.8(3) provided a clearly defined and well-recognized public policy sufficient to sustain her claim. *Id.* at 598–99. That section states, "[T]he policy of [chapter 22 is] that free and open examination of public records is generally in the public interest even though such examination may cause inconvenience or embarrassment to public officials or others." Iowa Code § 22.8(3).

We disagreed that this was a clearly defined public policy. *Carver-Kimm*, 992 N.W.2d at 599. As we explained,

> [T]he broad declaration as to what is "generally in the public interest" in Iowa Code section 22.8(3) is too general to serve as the basis for a wrongful discharge claim. In Carver-Kimm's view, if she was fired or her job duties were changed because she had done anything that, in a jury's view, furthered the general policy stated in section 22.8(3), she can sue for tort damages. That position is untenable and inconsistent with our precedent. If Carver-Kimm's position were correct, then a department spokesperson would have absolute job protection whenever they told or gave the media anything so long as the information could be traced to a public record. That could lead to chaos in state government. A department spokesperson would become the person who gets to *decide* the department's message, permanently, instead of the person who merely *delivers* it.

*Id.* (citations omitted).

Still, this did not leave the former employee without any possible avenue for relief. *Id.* We observed,

> When [the employee] was the custodian of records at the department, she was under a statutory duty to fulfill proper requests for public records. *See* Iowa Code § 22.3(1); *Belin* [*v. Reynolds*], 989 N.W.2d [166,] 174–75 [(Iowa 2023)]. If [she] was discharged for complying with that duty—which is what she alleges in her petition—those circumstances could support a claim.

*Id.* In other words, *Carver-Kimm* indicates that broad statements in the Iowa Code about statutory purpose don't constitute clearly defined public policies, but specific statutory commands do. *See id.*

We have identified three areas where a public-policy wrongful-discharge common law tort may be available: "(1) enforcing a statutory right, (2) refusing to participate in illegal activity, and (3) whistleblowing." *Koester*, 14 N.W.3d at 729. "An employee who is doing one of these three things may be engaged in protected activity." *Id.* These areas, of course, must be tied to the clearly defined statutory right or obligation. *See Carver-Kimm*, 992 N.W.2d at 598. Whistleblowing, at a minimum, must entail whistleblowing on illegal conduct. *Id.*

**B. Deciding This Appeal.** Applying this precedent here, we conclude that the district court got it right. At the outset, we note that two of the plaintiffs—King and Rall—appear not to have been aware of the experiments conducted by Dr. Rea on residents at GRC. This underscores that these are claims for wrongful discharge by *employees*, not claims for abuse by *residents*. To sustain their wrongful-discharge claims, the plaintiffs had the burden of identifying a specific constitutional provision, statute, or regulation that undergirded their protected activity and that was undermined by their dismissal. *See, e.g.*, *Berry*, 803 N.W.2d at 110 ("For Berry to succeed on his claim of wrongful discharge, he must identify a clearly defined and well-recognized public policy that would be undermined by his termination from employment."); *Lloyd*, 686 N.W.2d at 229 ("[I]n order to prevail on his wrongful-discharge claim Lloyd must first identify a clearly defined and well recognized public policy that would be undermined by his dismissal."). They didn't do so here.

In the district court and in their opening brief, the plaintiffs rely on general statements of policy. Thus, at the beginning of their opening brief, they characterize the clearly defined public policy on which they rely as one of "protecting persons with disabilities." Meanwhile, they mention only two actual Iowa statutes: Iowa Code sections 225C.1(2) and 230A.101(1). We agree with the district court that these statutes are essentially statements of legislative and departmental purpose and are not specific enough to support a wrongful-discharge claim. Section 225C.1(2) declares "the intent of the general assembly." Section 230A.101(1) states that the "role" of DHS is "to develop and maintain policies" that "shall address the service needs of individuals of all ages with disabilities." The text of these laws is similar to the aspirational language of Iowa Code section 22.8(3) that we deemed insufficient in *Carver-Kimm*. *See* 992 N.W.2d at 599 (explaining that the effect of "[t]he policy of [chapter 22 is] that free and open examination of public records is generally in the public interest" and that this type of "broad declaration . . . is too general to serve as the basis for a wrongful discharge claim" (first quoting Iowa Code § 22.8(3)).

The plaintiffs urge that *Dorshkind v. Oak Park Place of Dubuque II, L.L.C.*, allows broad statutory purpose language to sustain a public-policy wrongful-discharge claim. 835 N.W.2d at 304. We see the matter differently.

In *Dorshkind,* a marketing assistant working for an assisted living facility observed her supervisor and another supervisor allegedly forging state-mandated training documents for the dementia program. *Id.* at 297. The falsified documents purported to show that employees of the center had completed the required training. *Id.* The marketing assistant reported the forgery to her former supervisor, who forwarded her reports to the company's CEO. *Id.* at 298. An investigation ensued and the marketing assistant was fired. *Id.* The

assistant sued the company for wrongful termination in violation of public policy. *Id.* at 299. The case went to the jury, which found in favor of the assistant and awarded her actual and punitive damages. *Id.* On appeal, the employer argued that it should have been granted a directed verdict. *Id.*

We upheld the verdict except for the punitive damage award. *Id.* at 308–09. We reasoned, "[T]he Code and our administrative rules support a clearly defined and well-recognized public policy under the exception to the at-will employment doctrine." *Id.* at 304. As the plaintiffs here correctly point out, the principal *statute* we discussed in *Dorshkind* was a statement of goals and legislative findings. *Id.* (discussing Iowa Code section 231C.1 (2007)). This law referred to what "the general assembly finds," "[t]he purposes of establishing an assisted living program," and "the intent of the general assembly." Iowa Code § 231C.1(1), (2), (3) (2007).

But that wasn't all there was to the marketing assistant's case. We noted that the legislature had also conferred rulemaking authority on the elder affairs department and that the department had adopted administrative regulations requiring annual dementia-related training for employees. *Dorshkind*, 835 N.W.2d at 304–05 (citing Iowa Admin. Code r. 321—25.34(1)–(4)). As we put it,

> Thus, the administrative rules specifically articulated a concern for the health, safety, and welfare of dementia patients in assisted living facilities. Acting on this concern, the elder affairs department required the implementation of a training program with accompanying state-mandated training documents to safeguard dementia patients' health, safety, and welfare.

*Id.* at 305. In short, the marketing assistant proved that she was discharged for reporting "two coworkers forging state-mandated training documents pertaining

to the care of dementia patients." *Id.* at 306. On this full picture, we upheld the jury's liability verdict and award of actual damages. *See id.* at 309.

Here, the plaintiffs cited nothing comparable to the targeted regulations that were involved in *Dorshkind*. Rather, the plaintiffs cited only to two statutes using words like "intent," "role," and "policies," Iowa Code § 225C.1(2) (2020); *id.* § 230A.101(1)—the kind of statutes that we held in *Carver-Kimm* were not enough.

What occurred at GRC from 2017 to 2019 was cruel to the residents and wrong. It had many repercussions, including the closure of GRC, the displacement of its former residents, and the loss of a significant number of local jobs in and around Mills County. To the plaintiffs' credit, none of them were involved in the experimentation, and some of them didn't even know about it.

But the issue here is the narrowness of the wrongful-discharge tort, a point we have repeatedly emphasized in our caselaw. The tort doesn't apply just because an employee acted in furtherance of a public policy—even a vitally important public policy—and lost their job as a result. If that were the case, the door would potentially be open to litigation whenever an employee argued that they were defending a public policy and the employer disagreed. We require a "clearly defined" public policy, which means at a minimum a constitutional provision, statute, or regulation that draws a line between lawful and unlawful conduct. Then, if the at-will employee loses their job in reprisal for having engaged in legally protected conduct, for having refused to engage in illegal conduct, or for whistleblowing on illegal conduct (or conduct they were legally required to report), they may have a wrongful discharge in violation of public policy claim.

Amicus Voice of Reason, Inc. (VOR), urges this court, for the first time on appeal, to consider a more specific source of authority for the plaintiffs' public-policy claim: Iowa Admin. Code r. 441—30.5(5)(*b*).[6] That regulation states, "An individual receiving care from a state resource center shall have the right to . . . [g]ive informed consent, including the right to withdraw consent at any given time." *Id.*

However, that regulation and the Iowa Code provisions that it implements—sections 217.30, 218.4, 225C.28A, and 225C.28B—were never argued or cited to the district court. "[W]e do not normally allow amici to raise grounds for reversal not raised by the parties themselves." *Harrison v. Mickey*, 18 N.W.3d 477, 487 n.5 (Iowa 2025). We also don't normally allow new arguments on appeal, although parties can offer "additional ammunition for the same argument." *JBS Swift & Co. v. Ochoa*, 888 N.W.2d 887, 893 (Iowa 2016).

Because the clearly defined and well-recognized public policy is an *element* of the claim, advancing a new policy on appeal is not just "additional ammunition," it is a new argument or theory. *See Fitzgerald*, 613 N.W.2d at 282 (describing the clearly defined and well-recognized public policy as an "important element" of the claim). When we evaluate wrongful discharge in violation of public policy claims, we give separate consideration to each public policy urged by the plaintiff. *See, e.g.*, *Jones*, 836 N.W.2d at 144–45 (considering first the plaintiff's claim that the university's conflict of interest regulations were a clearly defined public policy, and then his claim that the university's sexual assault policy was a clearly defined public policy). We have said that "[f]or [the plaintiff] to succeed on his claim of wrongful discharge, he must identify a clearly defined

---

[6]In their reply brief, the plaintiffs echo the amicus's arguments about this regulation.

and well-recognized public policy that would be undermined by his termination from employment." *Berry*, 803 N.W.2d at 110; *see also Lloyd*, 686 N.W.2d at 229 ("[I]n order to prevail on his wrongful-discharge claim Lloyd must first identify a clearly defined and well recognized public policy that would be undermined by his dismissal.").

Error preservation is a matter of fairness to the parties and the trial court. *DeVoss v. State*, 648 N.W.2d 56, 60 (Iowa 2002). In January 2023, the district court granted summary judgment on the wrongful-discharge claim, finding it legally insufficient based on the arguments that were then before it. After that, the parties proceeded to litigate a narrow and fact-specific whistleblower case under Iowa Code section 70A.28 for over a year. In February 2024, the district court granted summary judgment on that claim as well, largely on factual grounds. This litigation—and the discovery conducted by the parties—could easily have taken a different turn if the plaintiffs had alleged a different, more specific public policy as the basis for their wrongful-discharge claim. Considering a new claim now for the first time on appeal would be unfair to the parties who have spent years litigating below and it would run counter to our role as an appellate court.

**C. Iowa Code Section 70A.28 as the Exclusive Remedy for a State Employee Alleging Adverse Employment Action in Retaliation for Whistleblowing.** Alternatively, we conclude that Iowa Code section 70A.28 is the exclusive remedy available to a state employee who, like the plaintiffs here, alleges they were discharged in retaliation for whistleblowing.[7] Section 70A.28(2) provides as to state employees:

---

[7]As noted, the defendants raised this as an alternative ground for granting summary judgment on count I, but the district court did not reach it.

A person shall not discharge an employee from or take or fail to take action regarding an employee's appointment or proposed appointment to, promotion or proposed promotion to, or any advantage in, a position in a state employment system administered by, or subject to approval of, a state agency as a reprisal . . . for a disclosure of any information by that employee to a member or employee of the general assembly, a disclosure of information to the office of ombudsman, a disclosure of information to a person providing human resource management for the state, or a disclosure of information to any other public official or law enforcement agency if the employee, in good faith, reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety.

Section 70A.28(5) authorizes the aggrieved employee to recover "affirmative relief including reinstatement, with or without back pay, civil damages in an amount not to exceed three times the annual wages and benefits received by the aggrieved employee prior to the violation of subsection 2, and any other equitable relief the court deems appropriate, including attorney fees and costs." *Id.* § 70A.28(5)(*a*).

In *Ferguson v. Exide Technologies, Inc.*, 936 N.W.2d 429 (Iowa 2019) (per curiam), we discussed generally the question of when a wrongful discharge in violation of public policy claim is foreclosed by the existence of a statutory remedy. *Id.* at 432–34. "[W]e have at times found a statute precludes the wrongful-discharge common law claim and at times found it does not." *Id.* at 432.

We pointed to a decision where we had held that the Iowa Civil Rights Act (ICRA) did not leave room for common law wrongful-discharge claims because the language of the ICRA was mandatory: that is, an aggrieved employee "must" initially seek an administrative remedy. *See id.* at 432–33; *see also Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 196–97 (Iowa 1985) (en banc). We also discussed a decision where we had found that Iowa Code chapter 400 provided

the exclusive means of challenging the arbitrariness of a civil service employee's discharge because the legislature had "provided a comprehensive scheme for dealing with a specified kind of dispute." *Ferguson*, 936 N.W.2d at 433 (quoting *Van Baale v. City of Des Moines*, 550 N.W.2d 153, 156 (Iowa 1996), *abrogated on other grounds by Godfrey v. State*, 898 N.W.2d 844 (Iowa 2017), *overruled by Burnett v. Smith*, 990 N.W.2d 289 (Iowa 2023)).

On the other hand, we noted two other cases where we had not found the common law wrongful-discharge claim preempted. *See id.* at 433–34; *see also George v. D.W. Zinser Co.*, 762 N.W.2d 865, 870–72 (Iowa 2009); *Tullis v. Merrill*, 584 N.W.2d 236, 239–40 (Iowa 1998). Importantly, both cases involved statutes that provided less robust administrative remedies, without mandatory language as contained in the ICRA. *Ferguson*, 936 N.W.2d at 434.

*Ferguson* required us to decide whether the statute regulating drug testing in the workplace—Iowa Code section 730.5 (2016)—foreclosed judicial recognition of an "overlapping" common law tort for wrongful discharge in violation of public policy. *Id.* at 430. We concluded that it did: "[W]hen a civil cause of action is provided by the legislature in the same statute that creates the public policy to be enforced, the civil cause of action is the exclusive remedy for violation of that statute." *Id.* at 435.

More recently, in *Halbur v. Larson*, 14 N.W.3d 363, we were asked to decide the exclusivity issue under the very statute involved here. *Id.* at 373. Thus, the question presented was whether an employee who had a remedy under Iowa Code section 70A.28 (2020) (and had obtained an award of damages thereunder) could also pursue a parallel claim for wrongful discharge in violation of public policy. *Id.* The case involved a former employee of the Iowa Alcoholic Beverages Division (ABD) who had lost his job because he had complained to the director

of the ABD that, among other things, the ABD had entered into an unlawfully no-bid contract. *Id.* at 368. We concluded that the "comprehensive civil remedy [in section 70A.28] obviates the justification for recognizing a common law discharge claim here." *Id.* at 375. "Otherwise, claimants could circumvent the legislature's chosen statutory limits on damages in section 70A.28(5)(*a*) simply by filing a common law whistleblower claim." *Id.*

In *Halbur*, we also rejected as preempted the employee's wrongful-discharge claim "due to his refusal to participate in illegal activity." *Id.* at 375. We held that the employee's "alleged refusal to engage in an illegal act is inextricably intertwined with his statutory whistleblower claim, and the statutory remedy is thus exclusive." *Id.* at 376. In particular, the employee's refusal to authorize payments under the no-bid contract was "premised on his belief that additional payments were 'a violation of the law' under section 70A.28. This is the same belief he had communicated to [the director]." *Id.* We concluded that the employee was "not entitled to a second trial to get additional damages for a statutory claim on which he already prevailed and was awarded damages." *Id.*

Although *Ferguson* and *Halbur* are relevant, we believe neither case controls the outcome here. In the present case, unlike in *Halbur*, the plaintiffs did not prevail on their section 70A.28 claims, or even get past summary judgment. They are not seeking "a second trial," but a first. *Cf. Halbur*, 14 N.W.3d at 376. Nor are the plaintiffs looking to the statute—i.e., section 70A.28—as the source of the public policy that is the basis for their wrongful-discharge claim. *Cf. Ferguson*, 936 N.W.2d at 435. They argue that the programs taking place at GRC were independently wrongful and illegal.

Nonetheless, we believe that section 70A.28 is a sufficiently "comprehensive" scheme or civil remedy that it should preclude any wrongful-discharge claim by a state employee based on whistleblowing. *See id.* at 433; *Halbur,* 14 N.W.3d at 375. In this regard, we note the following.

First, section 70A.28 is broad in scope, in many respects broader than the common law wrongful-discharge tort. It protects the employee from retaliation for any disclosure to a covered person if the employee "in good faith, reasonably believes the information evidences a violation of law or rule, mismanagement, a gross abuse of funds, an abuse of authority, or a substantial and specific danger to public health or safety." Iowa Code § 70A.28(2). Thus, while the common law tort requires the employee to have reported illegal conduct, section 70A.28 also shields the employee for disclosing mismanagement, abuse, or a danger to public health and safety. In addition, the remedies under section 70A.28 are robust, including not just damages but equitable relief and potentially attorney fees. *Id.* § 70A.28(5).

Second, although section 70A.28 only protects whistleblowing to certain individuals in state government—namely, "a member or employee of the general assembly, . . . the office of ombudsman, . . . a person providing human resource management for the state, or . . . any other public official or law enforcement agency," *id.* § 70A.28(2)—this is a broad category of persons. It can be argued that the point of section 70A.28 is to encourage state employees who see something wrong—such as the abuses at GRC—to notify someone who can do something about it. Notably, four of the five plaintiffs contend that they engaged in whistleblowing to the director of DHS, who is clearly a "public official" and therefore a covered person under section 70A.28. That's how section 70A.28 should work. In our view, it might water down the underlying policies behind

section 70A.28 to allow common law wrongful-discharge claims as a fallback where the state employee whistleblower didn't meet the statutory criteria because they didn't notify the right person.

Third, although section 70A.28 does not expressly provide that it is a state employee's *exclusive* remedy when they are a victim of retaliation for whistleblowing, we note that the initial version of section 70A.28 was enacted in 1984. *See* 1984 Iowa Acts ch. 1219, § 4 (codified at Iowa Code § 79.28 (1985)). We did not recognize a common law wrongful-discharge tort at that time; our first recognition of the tort occurred in 1988. *See Springer v. Weeks & Leo Co.*, 429 N.W.2d 558 (Iowa 1988) (en banc). There would not have been a reason for the legislature to include an exclusivity provision when it first adopted a version of section 70A.28.

For these reasons, we conclude that the exclusive remedy for a state employee who claims to have suffered an adverse employment action in retaliation for whistleblowing lies under section 70A.28.

The plaintiffs argue that they were discharged not only for whistleblowing but also for other protected conduct, in particular for refusing to engage in the human experimentation at GRC. We agree the record is undisputed that the plaintiffs didn't participate or have anything to do with the experiments on residents. Still, the record does not support a contention that the plaintiffs could have been discharged for any protected conduct other than whistleblowing. As noted, two of the plaintiffs—King and Ralls—had no knowledge of the experiments. A third plaintiff, Brodie, testified only that she expressed concerns about using Medicaid funds to purchase some of the AAT materials. She was then instructed to code the purchase using non-Medicaid funds, and she did so. Dr. Heffron and Dr. Langenfeld testified that at the initial meeting, they

concluded the pneumonia hydration program wasn't applicable to their residents. Both had no further knowledge or involvement; they left GRC soon thereafter.[8]

## V. Conclusion.

For the foregoing reasons, we affirm the district court's grant of summary in favor of the defendants.

**Affirmed.**

---

[8]In a declaration, Dr. Heffron stated,

> I was not asked to overhydrate my patients . . . because Rea and Rehman knew I would refuse to do so, just as I had refused to reduce other aspects of my medical care. It is my understanding that experimentation on patients began in earnest after I was removed from GRC. It is my belief that GRC removed me because they knew I would object to such overhydration.

Similarly, Dr. Langenfeld stated in a declaration, "I was not asked to overhydrate my patients . . . because Rea and Rehman knew I would refuse to do so[.]"

In effect, both Dr. Heffron and Dr. Langenfeld acknowledge that they weren't asked to participate in the program and therefore didn't have to refuse to participate in it.